ROBERT A. ALLABASTRO, Plaintiff-Appellant, v. WHEATON NATIONAL BANK, Defendant-Appellee.

Second District    No. 78-364

Opinion filed October 11, 1979.

Michael W. Coffield, Daniel J. Pope, and Robert T. Gruenberg, all of Coffield, Ungaretti, Harris & Slavin, of Chicago, for appellant.

Gary L. Taylor, of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff, Robert A. Allabastro, appeals from a judgment which forfeited his rights under an installment contract for the purchase of real estate and permitted the seller to retain all monies paid as liquidated damages.

The direct subject of the forfeiture and of this litigation is a tract of land consisting of 37.432 acres located at the northwest corner of St. Charles Road and Gary Avenue in Du Page County. However, this property is part of the original transaction between the parties entered into on May 25, 1970. The agreement was entitled "Option and Real Estate Sale and Purchase Agreement" and related to the purchase of 125.725 acres known as the Modaff Farm. The title holder of the property was the Wheaton National Bank as trustee under its Trust No. 871. The beneficiaries of the trust were various members of the Modaff family represented by John Modaff.

The agreement provided for a 180-day option in consideration of the payment of $10,000. The option was exercised on July 11, 1972. Under the original agreement, plaintiff's payment for the option was to be applied against the total purchase price if the option were exercised; conveyance of the farm was contemplated to be in four separate "take-out parcels" at specified prices per acre for each to be paid by plaintiff at the time of conveyance; plaintiff was to pay interest on the unpaid principal at the rate of 8% per annum; $62,437.50 of the plaintiff's first payment which he made on November 29, 1972, was, under the agreement, a reduction of the principal balance but was not to be credited against the purchase price for the purpose of allowing conveyances to the plaintiff until the closing of the last take-out parcel. The original agreement also contained a clause which provided:

> "5. Should the Purchaser not take out any parcel in any one calendar year, i.e. after the first take out, then and in that event, the Seller will keep, as liquidated damages, all purchase monies previously paid to Seller by Purchaser and this contract shall be null and void."

The closing date of the first take-out was originally set for June 13, 1972, and provided that at that time the purchaser would pay an additional $415,000 and the seller would convey title to what was described as "take-out parcel No. 1." The agreement further provided that on or before one year from the date of taking out parcel 1 that the purchaser would take out parcel 2 for the sum of $347,537.50; on or before two years after taking out parcel 1, the purchaser would pay $336,950 for

the purchase of take-out parcel No. 3; and on or before three years from the date of payment of take-out parcel 1, he would pay the sum of $356,587.50 for the purchase of take-out parcel No. 4.

The closing date of the take-out of the first parcel was extended until November 29, 1972, pursuant to a written amendment. There followed a second amendment dated November 29, 1972, a third amendment dated December 31, 1973, a fourth amendment dated December 31, 1974, a fifth amendment dated April 14, 1975, and a sixth amendment was dated October 7, 1975. In general, the amendments changed the take-out parcels and closing dates on each of the take-outs, made various other changes as to interest and permitted a 6.093 acre take-out from the last parcel prior to the date specified. The last take-out parcel was for the purchase price established by the original contract at $12,500 per acre or a total of $467,900.

Prior to April 1, 1976, plaintiff had paid for and defendant had conveyed 88.293 acres in three separate take-out parcels; plaintiff had made all principal payments due prior to April 1, 1976; plaintiff had made all interest payments on the unpaid principal balance for the period prior to October 7, 1975; had paid the real estate taxes on the farm for the years 1972 through 1974; and had paid the sum of $62,437.50 to be applied against the purchase price of the last take-out parcel.

In addition, plaintiff has improved the adjoining land purchased in the first three installments and has installed two 10-inch sanitary sewers and a one-eighth-inch water main on the final installment parcel. He testified that he has spent in excess of $65,000 in improving the final installment property, but the record does not specifically show if and to what extent the utilities installed by plaintiff enhanced the value of the last take-out parcel. There is testimony in the record that approximately $37,000 was allocable to the 6.093-acre tract which was originally part of the last take-out parcel and the remaining approximately $20,000 allocable to over-sizing utilities for the purpose of serving the last take-out parcel. The seller also admits that a portion of the utilities may have been extended upon the last take-out parcel, but claims that the record is not clear as to the extent of such extension, and the trial court made no specific findings on these issues.

The plaintiff testified that in early March of 1976 he called Modaff and informed him that he had negotiated a $500,000 loan to pay off the complete remaining balance in cash. He further testified that in the latter half of March Modaff called and suggested the possibility of splitting the payments, one to be paid during the calendar year of 1976 and the second part to be made in the calendar year 1977. It is not disputed that the parties discussed the cash payment of approximately $253,000 to be paid in 1976 and the acceptance of a note for the balance, which was to be

secured with a letter of credit from a federally chartered financial institution.

Defendant's attorney sent a letter to plaintiff dated April 26, 1976, recapping the conversation. Included in the letter was a form draft of a letter of credit, a copy of escrow instructions and a form of promissory note. The form of the letter of credit was stated to be in the amount of $213,589.04. It included a provision for the deposit of a $200,000 promissory note to accompany the draft on closing. The name of the issuing bank was left blank. The covering letter, however, advised Allabastro that Modaff had a "concern" over the lending limits of the State Bank of Lombard which Allabastro had indicated in his conversation, and would "prefer if possible" that the letter be issued by the correspondent bank, the Continental National Bank of Chicago. A draft of an escrow was also enclosed which included, among the other provisions, a reference to an irrevocable letter of credit "by the Continental Bank or the State Bank of Lombard." Modaff testified that he had not authorized the unsigned escrow in this form.

Allabastro testified that he consulted with the State Bank of Lombard and proceeded to secure participation financing from another bank. He said he procured a loan from the Commercial National Dank to pay off a prior loan to Lombard and said he secured a commitment from the Plaza Drive-In Bank to participate in the Lombard Bank's loan because the loan exceeded Lombard's legal limit. He further testified that he so advised Modaff in June of 1976 but that Modaff said he wanted to come in and discuss it. Allabastro testified that when Modaff came in on June 14 or 15 he made a call to an executive of the Lombard Bank to confirm the loan and that Modaff participated in the conversation through an amplified phone. According to Allabastro the officer testified that all was in readiness except the receipt of the additional approval from the participating bank. He said that Modaff did not raise any objection and in fact said that he was glad that the transaction was coming to a conclusion.

Allabastro testified that at a further date, in the latter half of June or the first part of August, Modaff took the position that he would not accept a letter of credit from the Lombard Bank and the participating bank because he did not feel the banks were sufficiently large enough to honor the commitments and that the only acceptable institutions would be the Continental or the First National Bank of Chicago. Allabastro also testified that on previous take-outs Modaff had accepted the cash on letters of credit drawn on the State Bank of Clearing. Modaff testified that he first suggested that they use a letter of credit issued by the First National Bank of Elgin, which was Modaff's employer, but found that because of his relationship with the bank the tax benefit would be destroyed; that Allabastro then offered a letter of credit from the Plaza

Drive-In Bank in Norridge but that he replied that it would not be acceptable and that he wanted letters of credit issued by major banks in Chicago to satisfy his family as to the risk. He said he named the Continental, the First National Bank of Chicago, the Northern Trust and the Harris Trust as acceptable. Modaff testified that probably in mid or late May, Allabastro called and said he wasn't able to accomplish this, that he then told Allabastro that he would have to go ahead with the cash transaction, and that Allabastro said that he would do so.

Modaff also testified to a further conversation with Allabastro in which he advised the purchaser that the letter shown to him was not a letter of credit from the Plaza Bank but merely an expression of intent to participate in the loan by issuing a letter of credit directed to the State Bank of Lombard. He confirmed the conversation with the officer of the Lombard Bank as testified to by Allabastro, but said that the officer merely said they were "arranging" a loan. He also testified to a further conversation in which he claimed that plaintiff suggested that the Modaff family participate with the Lombard Bank but that this was not acceptable. He said that in further conversations with Allabastro in July, August and early September Allabastro promised to get the cash payment. He also said that on the 29th of August he told Allabastro on the telephone that there was to be a family reunion of the 13 beneficiaries of the land trust to discuss what would be done. He testified that Allabastro told him that he didn't have all the money at that point. And after the meeting, in early September, Modaff said he told Allabastro that the original contract would be terminated, and, in response to a question from Allabastro, said that any new arrangement would have to be an entirely new negotiation. He said he mentioned the figure of $17,000 per acre. He had no further communication prior to the receipt of the complaint for declaratory judgment.

Plaintiff's complaint was filed on September 30, 1976. Plaintiff testified that he agreed to attempt to obtain financing that would please Modaff through the negotiations continuing into September; and that in early September Modaff threatened plaintiff with forfeiture unless $405,000 were immediately paid, being the total amount of the final installment plus an additional $168,000 not provided for in the agreement. He testified that while attempting to comply with Modaff's latest demand, Modaff caused the defendant bank to serve plaintiff with a notice of intent to declare the six-year-old contract forfeited 15 days later and that on October 1, 1976, he was served with defendant's written declaration of forfeiture.

It is agreed that on either September 15, or September 16, 1977, plaintiff tendered the full payment of $484,446 for the final installment, including interest, which was refused in court on the grounds that the

tender was late and did not include the 1975 taxes due on the final installment property. Plaintiff's trial attorney tendered the additional $65,553 for the 1975 property taxes, but the defendant refused to accept because it had already rescinded the contract.

After a number of hearings the trial court ruled that the contract was properly forfeited on the grounds that the plaintiff had not tendered payment of the 1975 taxes and was not ready, willing and able to perform on the contract prior to the forfeiture. The court also allowed the defendant to retain plaintiff's principal and interest payments totaling $217,000 as liquidated damages.

Plaintiff contends that under the contract terms he was entitled to perform within the calendar year 1976 which had not expired when the contract was declared forfeited; that, in any event, the forfeiture is inequitable under all the circumstances, including the fact of the tender; that the owner had waived the right to declare a forfeiture by accepting previous late payments and by giving insufficient notice of its intention to require strict compliance in the future; and that retention of payments and other benefits would in any event unjustly enrich the owners. The owners argue that the last take-out parcel must be considered as a separate transaction under which only a specific closing date was bargained for and which was not met; and that the failure to perform was not excused by any principles of equity.

■■■ The law applicable to the question whether the contract expressly provides for forfeiture is not in serious dispute. The contract language upon which a forfeiture right is grounded must be strictly and narrowly construed. (*Miles Homes, Inc. v. Mintjal* (1974), 17 Ill. App. 3d 642, 646.) A forfeiture provision will be construed against the party seeking to enforce it. (*Parenti v. Wytmar & Co.* (1977), 49 Ill. App. 3d 860, 869.) If the contract language is subject to a construction which will prevent a forfeiture, that construction must be applied, with ambiguous words construed most strongly against the party who executed the contract. (*Sears Roebuck & Co. v. Higbee* (1922), 225 Ill. App. 197, 200-01.) Nevertheless, if a forfeiture is properly declared no subsequent performance will relieve the offending party from the forfeiture. *Eade v. Brownlee* (1963), 29 Ill. 2d 214, 219; *Miles Homes, Inc. v. Mintjal* (1974), 17 Ill. App. 3d 642, 646.

The provision in the original agreement that if the purchaser does not take out any parcel "in any one calendar year" after the first take out the seller may keep, as liquidated damages, all purchase monies and void the contract, would only clearly appear to be applicable if the payment and take out were not made "in any one calendar year." Plaintiff thus would not have been in violation of the contract until January 1, 1977, with the resulting conclusion that the attempted declaration of forfeiture in

October of 1976 would have been premature. Plaintiff argues from this that any tender made by him would have been useless during the 1976 calendar year because the seller was demanding that he pay $168,000 in addition to the contract price. Defendant's position appears to be that the forfeiture clause must be interpreted to apply to the failure to close on any take-out parcel within any time period prescribed under the modifications to the agreement. It argues that modification was made by the sixth amendment which required a specific closing date "on or before April 1, 1976."

We find no provision, however, in either the original agreement or in the amendments which provides any clear contractual right to forfeit the contract for failure to make a payment except during a "calendar year." The sixth amendment as well as the other amendments did not change whatever rights the defendant had under the original contract to terminate, but merely preserved those rights in the same terms. Nevertheless, there may be a right to forfeit a contract for breach of its terms absent clear and unambiguous provisions for forfeiture in the agreement. The circumstances will be further examined to determine whether this forfeiture was therefore properly declared.

Under the sixth amendment the purchaser specifically agrees to purchase all the remaining real estate "on or before April 1, 1976" but there is no express language that timely performance is of the essence of the contract. The defendant concedes that the discussions of a split payment in March of 1976 and the continuation of those discussions after the April 1, 1976, closing date might be considered a waiver or suspension of defendant's right to timely performance, but argues that this was overridden by further circumstances.

It is uncontroverted that in June of 1976 Modaff expressed concern over the unpaid taxes for the year 1975 and the failure to take out the last parcel; that in August of 1976 he verbally advised plaintiff that the family were considering termination on the August 29 reunion; and that on September 3, 1976, he advised plaintiff orally that the family intended to forfeit the agreement. Defendant argues that any doubt in plaintiff's mind as to defendant's intention was clearly dispelled by service of the notice of intent to forfeit on September 15, 1976. Plaintiff however argues that defendant waived any right to declare a forfeiture by accepting three installment payments late and by not giving adequate notice of intent to require further strict compliance.

Again, the applicable law is not seriously in dispute. Where a party accepts late payments it may waive or suspend its right to timely payments and its right to declare a forfeiture unless the buyer is given a definite and written notice of the intention to require strict compliance with the contract in the future. (See *Kirkpatrick v. Petreikis* (1976), 44 Ill.

App. 3d 575, 577; *Krentz v. Johnson* (1976), 36 Ill. App. 3d 142, 145; *Cantrell v. Kruck* (1975), 25 Ill. App. 3d 1060, 1064.) To reestablish strict compliance, the notice must give a reasonable time for performance, and what is a reasonable time depends on the facts in the case. (*Kirkpatrick v. Petreikis* (1976), 44 Ill. App. 3d 575, 577. See also Annot., 55 A.L.R.3d 10, 16 (1974).) In *Krentz*, this court noted that "[w]hen, in effect, the seller has not been deprived of the general object of the sales agreement, equity has considered time of performance to be a mere formal defect which may be corrected by payment of the contract balance with interest." 36 Ill. App. 3d 142, 145.

We conclude that equitable considerations militate against the declaration of the forfeiture under all of the circumstances of this record.

In *Krentz v. Johnson*, this court stated:

"It has been stated generally, as defendants contend, that where a forfeiture has been declared in the manner prescribed in a contract the court will give effect to it. (See, *e.g.*, *Eade v. Brownlee*, 29 Ill. 2d 214, 219 (1963); *McDonald v. Bartlett*, 324 Ill. 549, 558-59 (1927).) It would appear, however, that the cases give effect to this rule when the result is not essentially unfair to either party. The equally familiar rule is that forfeitures are not favored by courts of equity and that parties will be relieved from a technical forfeiture of rights under a contract if injustice results from its enforcement. (See, *e.g.*, *Rose v. Dolejs*, 1 Ill. 2d 280, 289-290 (1953).) In *Rose*, the court stated on page 290:

'It is especially well settled that where the agreement is simply one for the payment of money, a forfeiture of land incurred by the nonperformance of the agreement will be set aside on behalf of the defaulting party or relief will be granted in any other manner made necessary by the circumstances of the case, on the payment of the debt, interest and costs, unless complainant has disbarred himself by his own conduct.'

Specific performance of installment land contracts has been granted despite late payments of money due under the agreement in by far the greater number of cases (see cases collected in 55 A.L.R.3d 10-150 (1974)). The principal factors considered significant in granting relief from forfeitures appear to be: The prior acceptance of late payments and whether the buyer has been given a reasonable warning that the seller will insist on prompt payment in the future (see *Lang v. Parks*, 19 Ill. 2d 223, 226 (1960); *Kingsley v. Roeder*, 2 Ill. 2d 131, 138-139 (1954)); the length of time involved in the delay and whether the default has been repeated (see Annot., 55 A.L.R.3d 10, §8 (1974)); whether substantial

payment has been made on the whole contract (see *Rose v. Dolejs,* 1 Ill. 2d 280 (1953)); whether the purchaser has substantially improved the property (see *Rose v. Dolejs,* 1 Ill. 2d 280 (1953)); and whether there has been a mere delay rather than a suspension of the payments (*cf. Hartman v. Hartman,* 11 Ill. App. 3d 524, 528 (1973), and *Monson v. Bragdon,* 159 Ill. 61 (1895)). When, in effect, the seller has not been deprived of the general object of the sales agreement, equity has considered time of performance to be a mere formal defect which may be corrected by payment of the contract balance with interest. See Annot. 55 A.L.R. 3d 10, 16 (1974). See also Restatement of Contracts §§275, 276 (1932)." (36 Ill. App. 3d 142, 144-45.)

See also *Miles Homes, Inc. v. Mintjal* (1974), 17 Ill. App. 3d 642, 646.

In *Beesley Realty & Mortgage Co. v. Busalachi* (1963), 28 Ill. 2d 162, and related cases cited by the defendant, specific performance has been denied on the application of a purchaser when time has been stated as the essence of the contract and the purchaser has substantially failed to perform. In *Beesley,* there was a sale of 84 lots for $138,000 payable in monthly installments entered into on December 18, 1958; the purchase price was in monthly installments of $2500 each in January and February 1959, $8,000 or more in the next installment, the balance in monthly payments of $5,000 or more beginning July 15, 1959, with payment of the remaining balance on December 15, 1960; there were additional provisions for delivery of five lots for each $9,000 paid and an additional 10 lots upon payment of $18,000 in six monthly installments of $3,000 with no interest predicated on the purchaser making certain improvements; and a specific provision afforded liquidated damages in the absence of "prompt payment." Up until August 16, 1960, the purchaser had paid the total of only $107,000 and the defendant had conveyed 58 lots to him. The purchaser secured the money necessary to make the payments on the improvements and assigned all of the interest in the contract to the plaintiff as security. By the fall of 1960, the purchaser was in substantial default and the notice of forfeiture was sent on October 20, 1960. There were no further payments nor any tender of payments. On these facts the supreme court refused to require the seller to specifically perform the contract to convey.

We also find other cases cited by the seller to be factually distinguishable.

■■ There were substantial payments made on the whole contract, improvements were made, which must, by their nature, enhance the value of the last parcel, the contract was of long duration and there were prior acceptances of late payments. The length of the notice that the seller would insist on prompt payments in the future thus appears to us to be

inadequate. In effect, the seller has not been deprived of the general object of the sales agreement and thus the purchaser should not be subject to the harsh result of forfeiture after having substantially, over a long period of time, performed its agreement to purchase the Modaff property.

We therefore reverse the judgment and remand the cause to the trial court with directions that the purchaser be permitted to close by paying the final installment in full together with all interest and taxes due to the date of payment. It is recommended that the trial judge on remand set a period of time for performance not less than 30 days and not more than 60 days. If the purchaser fails to perform within the time period set by the trial court that court is directed to reinstate its final judgment order from which this appeal has been taken.

Reversed and remanded with directions.

NASH and LINDBERG, JJ., concur.