THE CITY OF CHICAGO, Plaintiff, v. CHICAGO TITLE AND TRUST COMPANY, as Trustee, *et al.*, Defendants-Appellees (Steve Bedalow *et al.*, Defendants-Appellants).

First District (5th Division)   No. 1—90—1513

Opinion filed September 14, 1990.—Modified on denial of rehearing November 21, 1990.

Robert A. Handelsman, of Chicago, for appellants.

Righeimer, Martin & Cinquino, P.C., of Chicago (Leo N. Cinquino, Sandra L. Hebenstreit, and Celeste P. Cinquino, of counsel), for appellees.

JUSTICE LORENZ delivered the opinion of the court:

On May 4, 1990, we dismissed an appeal by Steve Bedalow and Delores Fritz in the instant case as premature for lack of jurisdiction in the absence of a finding below pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). Because such a finding has now been obtained and the appeal otherwise timely perfected, we proceed to consider the merits of the matter.

As we briefly outlined in our earlier opinion (reported at 197 Ill. App. 3d 1062, 557 N.E.2d 311), Bedalow and Fritz appeal from an order of summary judgment dismissing their action to assert ownership of the beneficial interest to property which was the subject of an eminent domain proceeding. We summarize, in greater detail below, pertinent facts from the record.

On August 28, 1987, the City of Chicago (City) filed an action for condemnation, pursuant to a "quick-take" under section 7—103 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 7—103), of property located at 2530-60 South Archer Avenue in Chicago. The "quick-take" was exercised in conjunction with development of a rapid transit line from the City to Midway Airport. The City's complaint named, as defendants, Chicago Title & Trust Company (CT&T), trustee of a land trust executed November 23, 1983, in which title to the property was held, Dominic Bertucci, named in the trust agreement as sole beneficiary, Bedalow, Fritz, and other unknown owners.

Subsequently, the City successfully moved for immediate vesting of fee simple title to the property and deposited $385,840 with the county treasurer in accordance with the circuit court's preliminary finding of just compensation.

Thereafter, Bedalow and Fritz, brother and sister, filed a four-count counterclaim (see 197 Ill. App. 3d at 1065, 557 N.E.2d at 542) seeking, essentially, to have themselves declared owners of the beneficial interest in the subject property. The counterclaim asserted Beda-

low and Fritz (counterclaimants)[1] merely assigned the beneficial interest in the subject property to Bertucci as security for a loan from him to enable the property to be purchased, and that, as of December 9, 1987, counterclaimants had performed their part of the agreement.

Specifically, the counterclaim alleged that, in 1983, Bertucci orally agreed to lend Bedalow $60,000 to permit Bedalow to purchase the property. Attached to the counterclaim, as an exhibit, was a three-page memorialization (Agreement), executed on November 23, 1983, embodying the terms of the loan. The Agreement stated in part:

"[Bertucci] has loaned to [counterclaimants] the principal sum of [s]ixty [t]housand [d]ollars ($60,000.00) to be repaid within (60) days of the date of this Agreement[.] *** Should [counterclaimants] be unable to repay the principal amount plus interest on or before the maturity date of sixty days (60) of the date of this Agreement, then additional interest of 1½% per month on the said principal balance and interest shall be added to the total sum due. In no event shall the full payment of the principal and accrued interest be made later than six (6) months of the date of this Agreement."

The Agreement indicated that as security for the loan, counterclaimants assigned the entire beneficial interest in the subject property to Bertucci and gave Bertucci sole power of direction over the trust. The Agreement provided:

"However, it is understood by and between all the parties hereto that said transfer of title to the *** property is only for purposes of securing the *** loan, and that upon full payment of the principal amount plus all accrued interest that [Bertucci] shall assign all beneficial interest and convey the power of direction to [counterclaimants], or to their assigns.

[Bertucci] agrees that he will not sell or encumber the title to said real property so long as [counterclaimants] are not in default.

[Counterclaimants] shall be considered to be in default if [the] principal sum and interest *** is not paid within the time limits hereunder set forth, or unless extended by [Bertucci] in writing. In the event of default, [counterclaimants] shall have no claim to reconveyance of title and hereby irrevocably and forever waive all interest in said property."

---

[1]Only Bedalow signed the verified counterclaim. However, we refer to Bedalow and Fritz collectively because the counterclaim indicates the allegations were made by both parties.

The Agreement was executed on the closing date.

The record indicates that counterclaimants failed to repay the loan in accordance with the terms of the Agreement. However, in the counterclaim, counterclaimants alleged nine $945 payments were made to Bertucci, four of which were accepted later than six months after the date of the Agreement. The counterclaim also alleged counterclaimants had paid an installment on real estate taxes on the property but that Bertucci neither paid any real estate taxes on the property nor filed notice of change with respect to ownership of the property with the county treasurer. The counterclaim further alleged Bertucci did not declare a default on the loan or notify counterclaimants of forfeiture. Last, the counterclaim recited that funds in satisfaction of the loan had been deposited with the county treasurer on December 9, 1987. More specifically, the record indicates Edwin Michaels, an acquaintance of counterclaimants' trial counsel, deposited $60,000 with the county treasurer on counterclaimants' behalf for the purpose of curing all defaults under the Agreement.

Based on the allegations summarized above, counterclaimants sought, in count I, reformation of the Agreement to reflect the parties' oral understanding. In count II, counterclaimants sought a declaration of the parties' rights alleging, additionally, that at no time prior to December 9, 1987, did Bertucci make written demands upon counterclaimants to cure any defaults or notify them that, unless any defaults were cured, Bertucci would seek to extinguish counterclaimants' rights in the property. In count III, counterclaimants incorporated the allegations of counts I and II and sought to have Bertucci convey the property to them or pay to them the preliminarily determined amount under a theory of specific performance. Count IV also incorporated the allegations of counts I and II and sought payment of the preliminarily determined amount under a theory of unjust enrichment.

Bedalow was deposed in January 1988. He testified he had originally contacted Bertucci, whom he knew as an acquaintance because they frequented the same neighborhood restaurant, upon the suggestion of another individual. Bedalow thereafter met with Bertucci at Bertucci's home, explained his intentions to build a restaurant on the property, and told Bertucci he only had a few days before the closing date of purchase. Bedalow stated Bertucci agreed to contact a friend at a bank and would obtain a loan in his, Bertucci's, name for a fee "under the table."

Bedalow stated he had approached Bertucci because he was unable to obtain the funds by other means prior to the closing date. Be-

dalow stated he had contemplated selling his home to pay Bertucci and actually told Bertucci he would pay the loan upon the subsequent sale of his home. Bedalow stated that there was no conversation between the date of the meeting and the date of closing about how Bedalow was going to pay the money back.

Bedalow stated the parties executed the Agreement at the closing. He stated he had not seen the Agreement prior to that time. Although Bedalow at first acknowledged, in response to counsel's question, that the Agreement reflected the parties' understanding regarding the transaction, he also stated the Agreement "was [the] complete opposite of [his] original conversation with [Bertucci.]"

As to the drafting of the Agreement, Bedalow testified that a few days before the closing, at Bertucci's direction, he went to see Rocco Montegna, an attorney, regarding documentation of the financing of the purchase. Bedalow stated he never told Montegna what he wanted included in the Agreement. At the closing, Bedalow stated, he scanned the Agreement and affixed his signature without asking Montegna any questions. Bedalow acknowledged that he understood the Agreement when he read it at home later that day. He maintained, however, that the Agreement was different than the transaction he and Bertucci had originally discussed. Bedalow admitted he understood the Agreement to mean that if he did not repay the amount of the loan within six months of the date of the Agreement, he would not have any right in the property.

Bedalow stated he made a total of nine payments of $945 each to Bertucci on the loan. The last payment was in January 1985 and probably consisted of a check written by his friend, Dominic Armato, since deceased, who made several payments on Bedalow's behalf.

In his deposition, Dominic Bertucci explained he became interested in the transaction when he learned through his accountant that Bedalow had contracted to purchase the property but was having difficulty raising funds to close the transaction. Bertucci stated he told Bedalow, when they initially discussed the loan, that as long as the loan was short term, he would be interested in lending Bedalow funds. He explained he desired the loan to have a fixed date for repayment because funds for the loan were from those he would need to meet his construction company's payroll. In any case, Bertucci stated he told Bedalow he would be interested in making the loan only if he was given 100% beneficial interest in the property. He stated Bedalow understood his concerns.

Bertucci characterized the parties' transaction as a loan with a condition that if the loan was not repaid within the time agreed upon,

Bertucci would own the property. Bertucci stated he understood Beda-
low was to sell his home to raise funds to retire the loan and stated
that, had he known Bedalow was not selling the house, he would not
have made the loan.

Bertucci stated he was represented at the closing by Anthony
Montegna, Rocco Montegna's son. Bertucci stated Montegna was
present to ensure title to the property was unencumbered and to pre-
pare a closing statement. Bertucci stated both Bedalow and Fritz read
and signed the Agreement at the closing and that the Agreement re-
flected the parties' understanding regarding the transaction's terms.
Bertucci stated he also first saw the Agreement at the closing. Ber-
tucci testified Rocco Montegna drafted the Agreement upon his direc-
tion of the terms.

Bertucci acknowledged Bedalow had made some payments on the
loan and admitted he did not pay real estate taxes on the property.

Bertucci also acknowledged he did not serve Bedalow with any de-
fault or forfeiture.

In other deposition testimony, Anthony Montegna stated he repre-
sented Bertucci at the closing in place of his father. At the closing, he
handed copies of the Agreement to Bedalow and Bertucci and told
Bedalow that, by executing the Agreement, Bedalow would have no
interest in the property. Montegna stated he explained that if the
Agreement did not accurately reflect what the parties desired, they
should not sign the document. He stated Bedalow had "panicked,"
but indicated a desire to close the transaction that day.

Rocco Montegna stated that in a discussion regarding the transac-
tion prior to drafting the Agreement, Bertucci told him he wanted the
property in his name because Bertucci wanted to be able to quickly
realize funds generated from the property if Bedalow defaulted. Mon-
tegna also stated that Bertucci explained to Bedalow that, upon a de-
fault, the property would be Bertucci's to sell.

On June 2, 1988, counterclaimants moved for summary judgment
on two of the counterclaim's four counts. The motion was supported
by the following exhibits: Bedalow's affidavit stating he made pay-
ments of $945 each to Bertucci on June 4, 1984, and June 15, 1984,
more than six months after the expiration of the six-month repayment
period, and that on February 1, 1985, he paid one installment of real
estate taxes on the property; a portion of the deposition testimony of
Nicholas Jankovich, Bertucci's accountant, indicating that Bertucci's
records showed receipt of four checks, each for $945, written by
Dominic Armato to Bertucci's construction company on April 3, 1984,
April 30, 1984, May 17, 1984, and June 15, 1984; and a portion of

Bertucci's deposition testimony in which Bertucci stated he did not directly tell Bedalow that Bedalow had "lost" the property because of a default on the loan.

Although not found in the record on appeal, a cross-motion for summary judgment was filed by Bertucci and CT&T on June 28, 1988.

Following argument on the motions, the trial judge issued a memorandum of his decision denying counterclaimants' motion, granting the cross-motion filed by Bertucci and CT&T, and dismissing, with prejudice, the entire counterclaim.

OPINION

Initially, we note that counterclaimants do not argue on appeal that an issue of genuine material fact existed which should have precluded the grant of summary judgment in Bertucci's favor. (See Ill. Rev. Stat. 1989, ch. 110; par. 2–1005(c).) Rather, counterclaimants contend summary judgment was not proper as a matter of law as based on the facts as developed because, by accepting late payments on the loan, Bertucci waived the benefit of the Agreement's forfeiture provision. In support of that contention, counterclaimants urge us to draw analogy to cases involving contracts for the purchase of land in which forfeiture clauses were found waived by the seller's acceptance of late payments in the absence of notification of an intent to rely on the contractual provision of timely payment. Counterclaimants contend the contract thus remained open for performance. Counterclaimants further reason they acted timely in pursuing ownership rights to the property because the action accrued only when Bertucci refused to accept the $60,000 deposited with the county treasurer as satisfaction of the loan in December 1987. Therefore, the defense of *laches* is inapplicable, contrary to the determination of the trial judge.

■ We are aware of no case in this State in which the waiver of a forfeiture clause has been asserted in an action involving a transaction such as the one in the instant case. However, forfeiture of title or other possessory interest in real property as consequence for the breach of a contract unrelated to the property's purchase is certainly within the realm of proper legal remedies to the nonbreaching party where the contract so provides. (See 3 Grigsby, Illinois Real Property §1411 (1948).) Thus, while it appears that courts in this State have found opportunity to address the relevant issues respecting waiver of forfeiture provisions most often in cases involving contracts for the purchase of land, the law as recited in those cases is directly applicable here.

We quote from *Allabastro v. Wheaton National Bank* (1979), 77 Ill. App. 3d 359, 395 N.E.2d 1212:

> "Where a party accepts late payments it may waive or suspend its right to timely payments and its right to declare a forfeiture unless the buyer is given a definite and written notice of the intention to require strict compliance with the contract in the future. [Citations.] To reestablish strict compliance, the notice must give a reasonable time for performance, and what is a reasonable time depends on the facts in the case." (*Allabastro*, 77 Ill. App. 3d at 365-66, 395 N.E.2d at 1217.)

Quoting from *Krentz v. Johnson* (1976), 36 Ill. App. 3d 142, 343 N.E.2d 165, the court added:

> " 'It has been stated generally *** that where a forfeiture has been declared in the manner prescribed in a contract the court will give effect to it. [Citations.] It would appear, however, that the cases give effect to this rule when the result is not essentially unfair to either party. The equally familiar rule is that forfeitures are not favored by courts of equity and that parties will be relieved from a technical forfeiture of rights under a contract if injustice results from its enforcement. [Citation.] In *Rose* [(*Rose v. Dolejs* (1953), 1 Ill. 2d 280, 116 N.E.2d 402)], the court stated ***:
>
> > "It is especially well settled that where the agreement is simply one for the payment of money, a forfeiture of land incurred by the nonperformance of the agreement will be set aside on behalf of the defaulting party or relief will be granted in any other manner made necessary by the circumstances of the case, on the payment of the debt, interest and costs, unless complainant has disbarred himself by his own conduct. [*Rose*, 1 Ill. 2d at 290, 116 N.E.2d at 409.]' "

Specific performance of installment land contracts has been granted despite late payments of money due under the agreement in by far the greater number of cases [citation]. The principal factors considered significant in granting relief from forfeitures appear to be: [t]he prior acceptance of late payments and whether the buyer has been given a reasonable warning that the seller will insist on prompt payment in the future [citations]; the length of time involved in the delay and whether the default has been repeated [citation]; whether substantial payment has been made on the whole contract [citation]; whether the purchaser has substantially improved the property [citation]; and whether there has been a mere delay rather than a

suspension of the payments [citations]. When, in effect, the seller has not been deprived of the general object of the sales agreement, equity has considered time of performance to be a mere formal defect which may be corrected by payment of the contract balance with interest. [Citations.]' " *Allabastro*, 77 Ill. App. 3d at 366-67, 395 N.E.2d at 1218, quoting *Krentz*, 36 Ill. App. 3d at 144-45, 343 N.E.2d at 167.

With the above considerations in mind, we examine the nature of the transaction in the instant case, as memorialized in the Agreement, and the parties' actions in performance of the Agreement, as shown by the facts so far established in the record to determine whether summary judgment was proper.

Under the Agreement, Bedalow was obligated to repay the principal amount loaned with accrued interest within 60 days of November 23, 1983, the date the Agreement was executed. In no event was the time for payment of the full amount due to exceed six months from the date of execution, approximately May 23, 1984. The Agreement provided that default, triggering forfeiture of Bedalow's right to claim reconveyance of title to the property, would occur if payment was not made within the above time limits, absent Bertucci's written extension.

The record reveals that some payments in accordance with the obligations under the Agreement were made either by Bedalow, or on his behalf, and were accepted by Bertucci. The exact number of payments and the exact time of their acceptance are disputed.

It is alleged in the counterclaim, which Bedalow verified, that nine payments were made and accepted by Bertucci on the amount owed. Four payments were allegedly made after May 23, 1984. In conjunction with counterclaimants' response to a motion by Bertucci to compel production of checks representing payments under the Agreement, the record contains photocopies of three cancelled checks dated June 4, 1984, February 25, 1984, and January 25, 1985, for $945, $945, and $1,074.93, respectively. Each of the checks was drawn on a checking account of Dominic Armato and made payable to Bedalow.

The checks dated February 25, 1984, and June 4, 1984, were specially endorsed by Bedalow as payable to Bertucci's construction company. The check dated January 25, 1985, was also specially endorsed by Bedalow but was made payable to a wholesale grocer and was deposited at a different bank than the checks endorsed in favor of Bertucci's construction company. We note, however, the amount of the January 25, 1985, check corresponds to the amount Bedalow stated in his affidavit that he paid in real estate taxes on the property on February 1, 1985.

The record also contains, as established in the deposition testimony of Bertucci's accountant, evidence of four recorded transactions in Dominic Armato's name in the records of Bertucci's construction company. Those records reflect deposits of $945 each on behalf of Bertucci's construction company on April 3, 1984, April 30, 1984, May 17, 1984, and June 15, 1984.

Initially, we note a question of fact exists as to whether the deposit recorded as being made on June 15, 1984, merely reflected acceptance of the check dated June 4, 1984, as Bertucci argues. Counterclaimants contend the June 15, 1984, payment was a second, separate payment accepted by Bertucci after the Agreement's six-month repayment period had lapsed. Nevertheless, we believe the undisputed acceptance of the check dated June 4, 1984, the understanding between the parties as embodied in the Agreement's language, and other facts in the record must preclude a grant of summary judgment in Bertucci's favor as a matter of law.

■ Although the forfeiture provision in the Agreement is clear as to its triggering events, the language is equally clear that transfer of title to Bertucci during the loan's pendency was intended only to secure repayment. Bertucci's own deposition testimony reveals the funds made available for the loan were needed to meet the payroll in Bertucci's construction business. Indeed, it was for that reason, Bertucci explained, that the loan had to have a short term and a definite repayment deadline. However, when Bedalow failed to meet his obligation in accordance with the Agreement, Bertucci did not respond by notifying Bedalow of default. Nor did Bertucci indicate an intention to capitalize on the forfeiture provision which might have served to fulfill the purpose for making time the essence of the Agreement. At no time did Bertucci indicate a change in ownership of the property. Instead, it appears Bertucci accepted at least one late payment in June 1984. Given the above, we believe an issue of fact is presented regarding whether Bertucci waived the right to claim a forfeiture of title to the property such that summary judgment should not have been entered. See *Brown v. Jurczak* (1947), 397 Ill. 532, 74 N.E.2d 821.

In terms of equity under the circumstances present here, to sanction a forfeiture in light of the acceptance of even a single late payment in the absence of any notification of intent to enforce the Agreement's timely payment clauses would be unfair. Without a forfeiture, both parties yet stand to benefit from their original bargain under the Agreement. Counterclaimants would enjoy the right to benefit from ownership interest in the land, the purchase of

which was made possible through sums loaned by Bertucci. And, because it is not apparent how Bertucci might have suffered real harm by the delay in timely payment, Bertucci would still benefit from the right to repayment of the principal loaned with accrued interest to date.

■ Further, we do not conclude counterclaimants' action should be barred by operation of *laches* as the trial judge determined. In addition to other considerations, *laches* can be invoked only where the claimant's delay in asserting a right has prejudiced the adverse party. (7 Ill. L. & Prac. *Chancery* §118 (1954).) As we have observed above, the record does not indicate Bertucci has been prejudiced by any delay in the filing of the counterclaim.

Last, we note that because Bertucci never indicated the Agreement was a default, *laches* would seem more properly applicable to bar an assertion of forfeiture rights. Bertucci's right to claim a forfeiture accrued automatically after the running of the six-month period following execution of the Agreement. It is less clear what right counterclaimants were tardy in asserting in the absence of notification by Bertucci of his intention to exercise the forfeiture provision.

For all of the above reasons, we reverse the circuit court's order granting summary judgment in favor of Bertucci and we remand the matter for further proceedings not inconsistent with this opinion.

Reversed and remanded.

GORDON and MURRAY,* JJ., concur.

---

*Justice Coccia recused himself following oral argument and disposition of the original appeal. Justice Murray then listened to the tapes of that argument and fully participated in the disposition of the appeal.