Reversed and Remanded Opinion of February 23, 2006, Withdrawn, and
Substituted Opinion filed March 2, 2006









 

Reversed and Remanded
Opinion of February 23, 2006, Withdrawn, and Substituted Opinion filed March 2,
2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00792-CV

____________

 

ILLINOIS TOOL
WORKS, INC.,
Appellant

 

V.

 

KEN HARRIS, Appellee

 



 

On Appeal from the 133rd
District Court

Harris County, Texas

Trial Court Cause No. 03-36790

 



 

S U B S T I T U T E D   O P I N I O N

The opinion of February 23, 2006, is
withdrawn because of a typographical error on page two of the opinion and this
substituted opinion issued in it=s place.








Appellee, Ken Harris, sued appellant,
Illinois Tool Works, for breach of contract. 
Appellee moved for partial summary judgment on the ground that the
contract was unambiguous.  Appellant
opposed the motion, but did not move for partial summary judgment.  The trial court granted appellee=s motion for
partial summary judgment and entered final judgment in appellee=s favor.  Appellant timely filed a notice of
appeal.  We reverse and remand.

Factual and Procedural Background

Ken Harris was a pioneering developer of
holographic technology.  On May 25, 2001,
Illinois Tool Works (AITW@) entered into a
contract with Harris to purchase Harris=s Direct Write
holographic technology (Athe technology@) and engage
Harris=s specialized
knowledge to further develop the technology. 
The contract involves multiple agreements executed together.  The major portions of the contract are the
Asset Purchase Agreement, the Employment Agreement, and the Consulting
Agreement.  The Consulting Agreement was
to begin when the Employment Agreement expired at the end of two years.  The contract provides that Illinois law will
govern the contract.

The opening paragraphs of the Employment
Agreement explain ITW=s interest and purpose for hiring Harris:

          WHEREAS,
in consideration for and in order to induce ITW to enter into the Asset
Purchase Agreements, Mr. Harris agreed to deliver this Employment Agreement and
a certain Consulting Agreement;

WHEREAS, Mr. Harris, as a pioneering
inventor of holographic technologies, has had substantial prior experience with
respect to developing, manufacturing and marketing holographic technologies,
equipment, products, and services;

WHEREAS, ITW seeks to hire Mr. Harris in
order to enjoy continued access to his special skills and knowledge relating to
the development, manufacture and marketing of holographic technologies,
equipment, products, and services; . . . .

 

Because of ITW=s desire for
Harris=s particular
skill, knowledge and experience, there were few opportunities to terminate
Harris=s obligations
under the contract, as provided for in the following excerpted provision in the
Employment Agreement:








Term.  The term of
employment (ATerm@) shall commence on the Closing
Date, and continue for two (2) years thereafter with Employee devoting himself
to his duties as specified herein on a full time basis (forty (40) hours week
[sic]) for forty (40) weeks during each of the two years.  The obligations hereunder shall terminate
immediately without notice upon (i) the death of Employee; (ii) the total
disability of Employee for a period in excess of six (6) weeks; (iii) the
voluntary resignation or retirement of Employee; or (iv) for Ajust cause@ as defined herein . . . . AJust Cause@ shall mean (a) Employee has been
convicted of criminal fraud, embezzlement, or a felony, or has been judicially
determined to have committed intentional misfeasance or malfeasance in the
performance of his duties hereunder to the detriment of ITW, which ITW
believes, in good faith, could have a material adverse effect on its business;
(b) Employee has committed a breach of the covenant not-to-compete . . . or of
the confidentiality agreement . . . ; or (c) if ITW believes in good faith that
Employee has failed to devote his full business time or best efforts to the Business.  ITW agrees that Employee may also be employed
by the DuPont Company during the Term of this Agreement; provided, however,
that such employment: (i) does not interfere with Employee=s obligations and duties under this
Agreement; and (ii) is limited to the development of a material or film for use
with the Direct Write Technology, as defined in the Direct Write Asset Purchase
Agreement.

 

(Emphasis added). 
Harris specifically negotiated for the italicized language to be
included.  The contract also contained
clauses prohibiting Harris from assigning his employment obligations.  Following the Employment Agreement, Harris
was to continue working for ITW as a consultant.

Paragraph Six of the Employment Agreement
addressed when the Consulting Agreement would become effective:

6.       Consulting
Agreement.  After the expiration
of this Employment Agreement Employee has agreed to become an independent
consultant of ITW, in accordance with the terms and conditions of the Consulting
Agreement, executed at the Closing of the Asset Purchase Agreement.

 

Like the Employment Agreement, the
Consulting Agreement outlined ITW=s interest in Acontinued access@ to Harris=s Aspecial skills and
knowledge.@ 
The term of the Consulting Agreement was to begin pursuant to the
following provisions:








WHEREAS, on May 25, 2003 and upon
termination of the two (2) year Employment Agreement, ITW seeks to enjoy
continued access to the special skills and knowledge of Mr. Harris relating to
the development, manufacture and marketing of holographic technologies, equipment,
products, and services

[ ]       

Term.  The term of
this Consulting Agreement (ATerm@) shall commence on the termination
of the Employment Agreement, which date is two (2) years from the Closing date,
and continue for three (3) years thereafter, with the Consultant devoting
himself to his duties as specified for twenty (20) weeks during each of the
three (3) years.  The obligations hereunder
shall terminate immediately without notice upon the death of Consultant.  ITW may terminate this Consulting Agreement
prior to the end of the three (3) year Term, if Consultant has committed a
breach of the confidentiality agreement . . . or a breach of the covenant
not-to-compete . . . to the detriment of ITW, or if ITW believes in good faith
that Consultant has failed to devote his twenty (20) weeks per year or best
efforts to the Business. 

 

Utilizing the provision for which he
specifically bargained, Harris terminated his employment with ITW in October
2001.  He offered to work as a consultant
beginning immediately, but ITW did not respond to his request.  In May 2003, when the Consulting Agreement
otherwise would have begun, Harris attempted to begin his consultancy.  However, ITW claimed Harris had repudiated
the entire contract and so did not allow him to perform under the Consulting
Agreement.  Harris brought suit and moved
for partial summary judgment, which the trial court granted.  Harris then sought attorney=s fees pursuant to
the contract and the trial court granted those in the Final Judgment.  ITW appeals the grant of partial summary
judgment.  

The question we must answer is whether or
not the term of employment could terminate under the Employment Agreement
before the end of two years without Harris also terminating the Consulting
Agreement.

 

 








Analysis

I.        Choice
of Law and Standard of Review 

The parties contractually agreed to apply
the law of Illinois to this contract.  Texas courts will respect that choice and
apply the law the parties choose. 
However, while the substantive law of Illinois may apply, we as the
forum will apply our own law to matters of remedy and procedure.  In re Wells Fargo Bank Minn. N.A., 115
S.W.3d 600, 605 n.7 (Tex. App.CHouston [14th
Dist.] 2003, original proceeding [mand. denied]).  Procedure includes standards of review.  Henderson v. Autozone, No.
14-97-01226-CV, 2000 WL 1425223, *2 n.1 (Tex. App.CHouston [14th
Dist.], September 28, 2000, pet. denied) (not designated for publication)
(citing Billman v. Mo. Pac. R. Co., 825 S.W.2d 525, 526 (Tex. App.CFort Worth 1992,
writ denied); Texaco, Inc. v. Pennzoil Co.., 729 S.W.2d 768, 787 (Tex.
App.CHouston [1st
Dist.] 1987, writ ref=d n.r.e.)).  The construction of an unambiguous written
instrument is a matter of law.  MCI
Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650 (Tex.
1999).  Therefore, we use Texas law to
determine what deference to give the trial court=s ruling, and
Illinois law to construe the contract.








ITW appeals the trial court=s grant of partial
summary judgment.  The trial court
determined that the contract was unambiguous as a matter of law.  We review legal determinations de novo.  MCI, 995 S.W.2d at 651.  When reviewing a partial summary judgment, we
use the same standards as when we review a summary judgment.  Carlton v. Trinity Universal Ins. Co.,
32 S.W.3d 454, 458 (Tex. App.CHouston [14th
Dist.] 2000, pet. denied).  The movant
has the burden of showing there is no genuine issue of material fact.  Id. 
When determining if there is a disputed material fact issue precluding
partial summary judgment, all evidence favorable to the non-movant is taken as
true, every reasonable inference must be indulged in favor of the non-movant,
and all doubts are resolved in favor of the non-movant.  Id. 
In this case we are asked to make a purely legal conclusion: is the
contract unambiguous and, if so, what is its meaning.  There are no factual disputes.  Thus, without any deference to the trial
court, we utilize Illinois law to determine the meaning of the contract.

II.       Construing
the Contract

A.      Principles
of Contract Construction under Illinois Law

When construing a contract, courts[1]
are to give effect to the parties= intent.  Henderson v. Roadway Express, 720
N.E.2d 1108, 1110 (Ill. App. Ct. 1999). 
We determine the parties= intent using the
plain and ordinary meaning of the contract=s language, unless
that language is ambiguous.  Id.  A contract is ambiguous only if it is
susceptible to more than one reasonable construction.  Id. 
If a contract is susceptible to more than one construction and one of
those makes the contract fair, customary, and such as prudent people would
naturally execute, while the other would make it inequitable, unusual, or such
as reasonable people likely would not execute, we will adopt the rational and
probable interpretation.  Nutrasweet
Co. v. Am. Nat=l Bank and Trust Co. of Chicago, 635 N.E.2d 440,
445 (Ill. App. Ct. 1994).  Stated
differently, we will not construe a contract to achieve an absurd result.  Scheduling Corp. of Am. v. Massello,
456 N.E.2d 298, 303 (Ill. App. Ct. 1983). 
Also, we construe the contract so as not to render any of the language
superfluous.  See Boulevard Bank Nat=l Ass=n v. Philips Med.
Sys. Int=l B.V., 811 F. Supp. 357, 364 (N.D. Ill.
1993) (applying Illinois law).  When, as
here, multiple agreements are executed together as part of the same
transaction, we construe them in reference to one another because they are one
contract.  In re Estate of Mayfield,
680 N.E.2d 784, 789 (Ill. App. Ct. 1997). 


B.      The
Contract is Not Ambiguous and Expresses the Parties= Intent for Harris
to Work Continuously for Five Years     








The contract evidences ITW=s intent to have
continued access to Harris=s knowledge and
skill in relation to the technology it purchased.  However, although the contract evidences ITW=s intent to have
continued access to Harris for one purpose, it is poorly drafted insofar as it
does not address what results if Harris resigns early.  This dispute concerns whether, by ending his
obligations under the Employment Agreement=s Term, Harris
also ended either or both parties= obligations under
the remainder of the contractCspecifically, the
Consulting Agreement.  To answer that
questionCwhich is not
provided for in the express terms of the contractCwe apply Illinois
rules of construction.  

ITW and Harris executed one contract with
multiple parts.  The three major
components were the Asset Purchase Agreement, the Employment Agreement, and the
Consulting Agreement.  Each of these
relate to the technology Harris developed with the express intent to make the
technology developed further and marketable. 
Also evident in the contract is the key, continuous role Harris was to
play in that development.  Several
provisions throughout the contract show this intent.  We take each of the major components in turn,
and then explain our interpretation.

1.The Asset Purchase Agreement

The Asset Purchase Agreement is the
lengthiest of the agreements.  It
concerns the sale of the technology. 
However, its terms also anticipate and emphasize Harris=s role in further
developing that technology so as to make it marketable.  In addition to the normal terms of sale, the
Asset Purchase Agreement has a condition precedent to purchasing the
technology: Harris was required to execute both the Employment Agreement and
the Consulting Agreement.  Thus, both
parties understood that ITW would not purchase the technology without Harris=s contractual
commitment to further develop the technology according to the terms of the Employment
Agreement and the Consulting Agreement. 
Clearly, ITW was interested not only in the technology, but also in
Harris=s services as an
employee and a consultant.  Because we
must harmonize each of the agreements, giving effect to each term so as to
effectuate the parties= intent, we turn now to the various
provisions of the Employment Agreement and the Consulting Agreement. 








Reading the plain language of the two
remaining major componentsCthe Employment
Agreement and the Consulting AgreementCit is clear that
ITW hired Harris for one purpose: to further develop his technology over a continuous
period and then assist in marketing that technology.  His services were not intended for other
projects.  This was a nascent
technology.  Without continued
involvement in the project, Harris=s knowledge and
skill would no longer be current or as useful. 


2.       The
Employment Agreement

The >Whereas= clauses of the
Employment Agreement, outlined above, elucidate ITW and Harris=s understanding as
they reference Acontinued access@ to Harris=s Aspecial skills and
knowledge.@ 
ITW wanted Harris=s help over five years as his technology
developed, changed, and went to market. The entire focus was development of the
technology in every respect so ITW could successfully launch the technology.

Yielding additional support to our
reading, the Term of the Employment Agreement discusses not only the duration
of the contract and how the parties could terminate their obligations, but also
contains a provision allowing Harris to work for DuPont.  Although ITW otherwise prohibited Harris from
other employment, it allowed his employment with DuPont for the specific
purpose of developing products compatible with the technology.  Presumably, that compatible technology was
important to making the technology marketable and profitable.  Regardless, it further shows that ITW wanted
Harris=s attention to
focus solely on developing the technology in one way or another over the course
of five years.  Additionally, the
Employment Agreement specifically forbids Harris to assign his obligations.  Read in context of the entire Agreement, ITW
and Harris contemplated an ongoing relationship focused solely on launching the
technology.  ITW believed that if Harris
could not be continually involved, the purpose of the project and the Asset
Purchase Agreement would not be achieved.








Later, in paragraph six, the Employment
Agreement references the Consulting Agreement and states the Consulting
Agreement will commence in accordance with its terms after the Employment
Agreement expires.  This paragraph,
although the only instance using the term Aexpiration,@ reveals that the
parties intended to operate under the Consulting Agreement only if the
Employment Agreement expired.  There were
four ways to terminate the Employment Agreement early, but only one way for it
to expireCif Harris worked for the full employment
term.  

The Consulting Agreement would not take
effect unless the parties complied with its terms.  Thus, we must turn now to the Consulting
Agreement to determine whether or not the parties intended to allow Harris to
resign and later, after no involvement with the technology for almost two
years, return as a consultant to the project. 


3.       The
Consulting Agreement

Consistent with the other two Agreements,
the Consulting Agreement explains that ITW entered into this Agreement so as to
enjoy continued access to Harris=s special
knowledge and skill.  It also contains
provisions allowing his employment with DuPont and prohibiting his assignment
of employment responsibilities.  In two
separate paragraphs, the Consulting Agreement specifically references when it
will commence.  The Term=s first sentence states
the Consulting Agreement begins upon Atermination of the
Employment Agreement, which date is two (2) years from the Closing date
. . . .@  (Emphasis added).  The clause, Atermination of the
Employment Agreement,@ is modified and described by the
following clause, Awhich date is.@  While it would have been clearer had the
parties used the word Aexpiration@ in this clause as
they did in paragraph six of the Employment Agreement, it still shows the
parties= intent.  They intended the Consulting Agreement to
take place upon a termination of the Employment Agreement if the date of
termination were two years from the closing date.  To hold otherwise would rule the clause
modifying Atermination of the Employment Agreement@ meaningless and
superfluous.








Additionally, because Harris could not
assign his duties and, given the wording of the >Whereas= clauses, we
believe the Consulting Agreement reinforces the parties= intent to have
Harris work continuously to develop the technology over the course of five
years.  Although we do not agree with ITW=s argument that
the contract establishes a condition precedent regarding what Harris must
fulfil before beginning work as a consultant,[2]
we do agree that Harris either had to work continuously over five years or, by
exercising his right to terminate employment, terminate any other right to
employment or a consultancy.  The
contract is consistent and repeats that theme throughout.  It also is unambiguous in this situation:
Harris would either work continuously for five years to develop the technology
and compatible products, or exercise his right to terminate the agreement
altogether.  He did the latter.[3]

C.      Harris
Terminated His Obligations under the Terms of the Contract








As Harris states in his briefing, he had
the right to terminate his employment under the contract.  If so exercised, the obligations under the
contract would terminate immediately.[4]  He exercised that right and it terminated
both parties= obligations under the entire contract in
regard to his employment in any capacity. 
To conclude otherwise would render parts of the contract superfluous,
which we will not do,[5]
or achieve an absurd result, which we also avoid.[6]  Our holding properly harmonizes the contracts
so as to achieve the parties= intent.

1.       Harris=s interpretation would render
portions of the contract superfluous and directly conflict with the parties= express intent

 

Harris encourages us to read the contract
so as to say that he may exercise his right to end his employment before the
end of two years and then accept his consultancy.  That reading would render superfluous the
other terms of the contract clearly expressing ITW=s desire that
Harris work continuously to develop the technology.[7]  

We have detailed extensively the various
provisions of the contract evidencing ITW=s desire for
continuous access to Harris and Harris only. 
As we have explained already, ITW envisioned that Harris would devote
his time, over five years, to developing both the technology and companion
technology.  Harris was a Apioneering
inventor@ of this
technology, which evidently was not developed completely.  Regardless of Harris=s specialized
knowledge and skill, ITW did not anticipate he would be helpful to the process
were he not involved continuously and exclusively.  To hold otherwise would render superfluous
those provisions of the contract clearly expressing that belief.  Ours is the rational and probable
interpretation.








2.       Harris=s proffered
construction would lead to an absurd result

ITW argues in its briefing that Harris=s construction
would lead to an absurd result.  To make
the point, ITW offers two examples of what Harris=s construction
would allow: (1) Harris could work for one day, walk away from the contract,
and ITW still would be required to hire him two years later as a consultant
when he would no longer have current knowledge; and (2) Harris could be fired
for just causeCsuch as embezzling money from ITWCand, again, ITW
still would be forced to hire him as a consultant.  We agree with ITW that these are absurd
results.  We also agree that Harris=s reading would
necessarily allow these results.

Harris counters both arguing that: (1) we
may not re-write the contract to make it fairer than the parties contracted
for;[8]
and (2) had Harris done something worthy of firing for Ajust cause,@ he would have
breached the contract and so ITW would be relieved of its obligations.  Neither of these arguments is
convincing.  

As to the first, we have outlined already
that ITW specifically contracted for Harris=s continuous work
on developing the technology.  The terms
of the contract provide that if Harris does not work continuously, then he may
no longer work for ITW at all under this contract.  Utilizing Illinois law, we will not re-write
the contract to provide better terms for Harris than he bargained forCespecially when
such a re-write would render much of the contractual language superfluous and
achieve a result wholly foreign the entire focus of the contract.








Concerning Harris=s second argument,
it does not line up with the contract=s language.  If Harris were fired for embezzling, it would
not be for a breach of contract.  Indeed,
the contract contains no clauses that would be breached by embezzlement or
criminal fraud.  Rather, termination for
just cause would be pursuant to the contract=s clear
language.  Just as Harris recognizes in
his brief that AHarris= resignation did
not constitute a breach of the Employment Agreement . . .,@ neither would
each element of just cause be a breach of contract.  The contract lists several reasons for which
ITW may fire Harris for just cause.  Some
of those, such as violating the covenant not-to-compete, would breach other
contract provisions.  Others reasons,
such as those ITW notes, would not. 
Thus, if Harris acted in a way constituting Ajust cause,@ it does not
follow that he necessarily would have committed a material breach and thus
excuse ITW from further performance. 
Additionally, it is possible that, under Harris=s interpretation,
a breach of the Employment Agreement=s term would not
invalidate the Consulting Agreement. 
Under Harris=s reading, ending one agreement does not
necessarily end the others.  Thus, it
does not follow under his reading that if his employment ended for Ajust cause@ that the
Consulting Agreement also would end.

We will not adopt a construction that
would lead to absurd results, render parts of the contract superfluous, and
ignore the parties= intent.

3.       Our
reading does not result in a forfeiture

Harris attempts to frame the case as one
involving a possible forfeiture.  Arguing
that Illinois does not favor forfeitures, Harris contends that ITW=s reading would
result in a forfeiture of the Consulting Agreement unnecessarily.  See generally Allabastro v. Wheaton
Nat=l Bank, 395 N.E.2d 1212, 1216 (Ill. App.
Ct. 1979) (stating that Illinois courts narrowly construe contractual
provisions upon which forfeitures are based). 
Yet, forfeiture is not at play in this case.








As an initial matter, we agree with Harris
that Illinois law disfavors forfeiture. 
However, the cases we have found regarding forfeiture involve primarily
installment land-contract cases, which included equitable concerns.  See generally Allabastro, 395 N.E.2d
at 1213, 1217; Hettermann v. Weingart, 458 N.E.2d 616, 617 (Ill. App.
Ct. 1983).  The same facts and concerns
are not present in this case. 
Additionally, the result we reach does not amount to a forfeiture or
penalty.  Harris voluntarily exercised
his right under the contract and thus voluntarily relinquished his right to a
consultancy.  There is no forfeiture and
those cases are inapposite.

III.      We
Do Not Address ITW=s Alternative Arguments

ITW raises two other arguments upon which
we may reverse: (1) The contract language is ambiguous; and (2) Harris
anticipatorily breached.  Because our
disposition of the first issue disposes of the entire appeal, we do not reach
these other questions.

Conclusion

Because we determine the contract is
unambiguous in favor of ITW, we reverse and remand for further proceedings
consistent with this opinion.

 

 

 

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

 

Judgment
rendered and Substituted Opinion filed March 2, 2006.

Panel
consists of Justices Fowler, Edelman, and Guzman.











[1]  In this
opinion, when referring to Acourts,@ or  Awe,@ we simply mean any court utilizing Illinois
substantive law.





[2]  Illinois
courts do not favor conditions precedent. 
Boulevard Bank Nat=l
Ass=n v. Philips Med. Sys. Int=l B.V., 811
F. Supp. 357, 365 (N.D. Ill. 1993) (applying Illinois law) (citing cases).  Without plain, unambiguous language,
contracts are construed as not having conditions precedent.  Id. 
In this contract, not only is there no plain, unambiguous language
indicating conditions precedent for Harris=s
employment as consultant, but also the parties had expressly included a clause AConditions Precedent@ in the
Asset Purchase Agreement.  Thus, the
parties specifically declined to make certain aspects of the contract conditions
precedent.  Consistent with Illinois law,
we will not re-write the contract and construe it to contain additional
conditions precedent.





[3]  Had any of the
other terms of the contract been used to terminate the obligationsCsuch as just cause or disabilityCthen the result would be the same.  Pursuant to the terms of the contract,
neither party would have a further obligation to fulfill under the Consulting
Agreement.  





[4]  There is a
question neither party directly addresses in the briefing: exactly what does Ahereunder@ mean in
the Term of the Employment Agreement? 
Stated differently, do the obligations Ahereunder@ encompass only the Employment Agreement, or flow down
to the Consulting Agreement as well?  Our
holding resolves this question by determining Ahereunder@ means the entire contract, including the Consulting
Agreement.  The Agreements are one
contract, to be read together, and each follows the other.  The Employment Agreement does not take effect
without execution of the Asset Purchase Agreement, and the Consulting Agreement
does not take effect without completion of the Employment Agreement.  Thus, it follows, that if obligations under
one terminate, so do obligations under the others unless specifically written
to survive the employment and consultant relationshipsCsuch as the covenant not-to-compete.  Our holding today in no way affects other
terms of the contract meant to extend beyond any employment relationship.





[5]  See
Boulevard Bank Nat=l Ass=n, 811 F. Supp. at 364.





[6]  See Massello, 456 N.E.2d at 303.





[7]  Harris
evidently offered to work as a consultant immediately upon resigning his
employment.  However, such an arrangement
was not contemplated under the contract and therefore does not affect our
holding.





[8]  See
Frederick v. Prof=l Truck Driver Training Sch., Inc., 765 N.E.2d 1143, 1152 (Ill. App. Ct. 2002).