SCHEDULING CORPORATION OF AMERICA, Plaintiff and Counterdefendant-Appellant, *v.* MICHAEL F. MASSELLO, Defendant and Counterplaintiff-Appellee—(National Business Consultants, Defendant-Appellee).

First District (2nd Division)   No. 82—1429

Opinion filed November 8, 1983.—Rehearing denied December 7, 1983.

Robert E. Neiman and William J. Harte, both of Chicago, for appellant.

Erbacci, Syracuse & Cerone, Ltd., of Chicago (Sidney Z. Karasik, of counsel), for appellees.

JUSTICE STAMOS delivered the opinion of the court:

Scheduling Corporation of America (SCA) sought to enjoin defendant Michael F. Massello from using SCA sales information and from breaching his covenant not to accept employment from present and former SCA clients within a year after leaving SCA's employ. SCA amended its complaint to include Massello's corporation, National Business Consultants (NBC), as a defendant and to drop all claims for relief except for money damages. Massello counterclaimed for compensation allegedly due him by SCA. Following a bench trial, judgment was entered against SCA and for Massello in the amount of $165,619.50. SCA appeals.

Plaintiff SCA provides management efficiency services which include scheduling systems to improve a business' efficiency and to allow monitoring by management. Hereinafter, the services provided by SCA will be referred to collectively as "scheduling" services.

Defendant Massello began working for SCA in 1974. Massello moved into sales in 1976 and soon took over the primary sales responsibilities for the company. As part of his sales efforts, Massello kept certain records which consisted of index cards, "hot lists," and correspondence files. The index cards contained the names of about 200 prospective clients. These cards, which were prepared by Massello, also contained the names of key contacts and personal observations regarding the best means of "selling" the prospect and as to the prospect's "temperature" (receptivity). The hot lists were prepared periodically by Massello for George Stout, SCA's president, to inform him which clients were interested in SCA's services. The information on the hot lists was gleaned from the index cards. The correspondence files contained written communications between Massello and the prospective clients. Massello also had in his possession client lists which were prepared by SCA's office staff.

In January of 1974, all SCA employees, including Massello, entered into an "Agreement" with SCA which was terminable at will by either party with notice and without cause. The agreement stated that the list of SCA's clients is an important and valuable asset and contained a promise that the employee will not disclose to outsiders either the client list or information learned about clients.

Upon moving into sales in 1977, Massello and SCA entered into a

"Compensation Agreement for 1977" which provided for a base salary of $26,000 a year plus two commission plans, one for 5% and the other for 2½%. Massello was to receive 5% on what may generally be referred to as "cold sales," *i.e.*, sales without introduction from another source and all referrals from 5% clients which resulted in a sale. He was to receive 2½% on all other sales which included extensions of work within the same project and sales resulting from referrals from 2½% clients. Both the 2½% and 5% commissions were to be paid when SCA received payment from the client.

Massello received compensation as set forth under the 1977 agreement up through February 1979. In 1977, Massello received between $70,000 and $80,000 including salary. In 1978, Massello was paid $135,000 including salary. Up to March 23, 1979, Massello received between $40,000 and $50,000.

On March 23, 1979, Massello received his paycheck for the preceding four-week period. The check did not include the 2½% commissions for that period which came to approximately $9,000. Massello asked Stout's secretary to explain the omission and she stated that Stout informed her that he (Massello) would no longer receive the 2½% commission. Massello contacted Stout in Florida but apparently received no satisfactory explanation for Stout's change in Massello's compensation arrangement. Massello continued to perform his duties until April 5, 1979, when he tendered his letter of resignation.

At the time of his resignation, Massello took with him the sales information in his possession, including the index cards. On April 9, four days after the resignation, Stout made a written demand for the return of the sales information taken by Massello. Massello returned the index cards immediately, but not before deleting comments regarding his personal opinion of certain contacts. He testified that he did not want those comments revealed to his contacts. Massello returned the hot lists and client lists to SCA in November 1979, pursuant to a discovery order. The hot lists were several months or years old at the time of Massello's resignation and the client lists were copies of lists produced by the SCA staff.

Following his resignation, Massello formed his own scheduling firm, National Business Consultants. As part of NBC's sales force, Massello hired James Conklin, Harry Wilkins, Dwight Gressel, and Daniel Schreiber, all former SCA employees. Massello spoke to Conklin about coming to work for NBC in August or September of 1979 and Conklin began to work for NBC on September 21, 1979. Conklin, in turn, talked to Wilkins, Gressel, and Schreiber in November 1979 about coming to NBC, which they did.

In the year following Massello's resignation, Massello and the former SCA employees solicited the employment of several of SCA's prospective, present, and former clients, including several Blue Cross/Blue Shield plans. There are 110 such plans nationwide and, up to 1979, SCA had sold its services to eight of them, which accounted for between 50% to 60% of SCA's business. During Massello's employment with SCA, he contacted approximately 75 Blue Cross plans. He contacted 17 of these plans within the year after he left SCA, but none of them bought NBC's services. Massello and his employees also contacted several other SCA prospects, but none of them hired NBC.

SCA filed suit to enjoin Massello from soliciting their present and former clients. Massello counterclaimed for compensation allegedly · due him. SCA thereafter amended their complaint to join NBC as a defendant and to drop all claims for relief except damages. Following a bench trial, the court ruled against SCA and in favor of Massello, who was awarded the $165,619.50 sought in his counterclaim. SCA then instituted this appeal.

SCA first contends that Massello's retention of SCA sales information after his resignation constituted a wrongful conversion of SCA property. The subject of the alleged conversion was sales information consisting of the index cards, hot lists and client lists kept by Massello. The index cards were returned upon demand but not before certain deletions were made. The client lists were returned in November of 1979 pursuant to a discovery order. At that time, the hot lists which Massello had not disposed of were also returned. SCA contends that Massello's retention of these lists and cards injured its sales efforts.

■■ ■ The elements of an action for conversion are (1) an unauthorized and wrongful assumption of control, dominion, or ownership by a person over the personalty of another; (2) his right in the property; (3) his right to immediate possession of the property; and (4) a demand for possession thereof. (*Farns Associates Inc. v. Sternback* (1979), 77 Ill. App. 3d 249, 252, 395 N.E.2d 1103.) A conversion can occur when property is wrongfully acquired or wrongfully retained. (See *Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.* (1971), 2 Ill. App. 3d 978, 981-82, 276 N.E.2d 89.) The fact that the property has no market value does not restrict the recoverable damages if they are attainable in some rational way. See *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 1025, 327 N.E.2d 346.

■■ In the instant case, Massello admitted that when he took the lists and cards he was aware that they were property to which SCA was entitled. SCA demanded the return of the sales information four

days after Massello's resignation. Thus, an action for conversion was clearly established.

■■ ■ The question raised regarding the conversion count is the sufficiency of proof as to damages. SCA claims to have suffered $24,000 in damages from Massello's conversion. Where, as here, the property converted has no market value, the proper basis for determining compensatory damages is an examination of its actual value to plaintiff. (See *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 1025, 327 N.E.2d 346.) The burden of proof is on plaintiff and the evidence must afford some reasonable and proper basis for ascertaining value. (27 Ill. App. 3d 1013, 1025.) "At a minimum, [the evidence] must rise to the dignity of proof, and supply such elements of standards for measuring value to enable the trier of fact to exercise its judgment." 27 Ill. App. 3d 1013, 1026.

The only evidence of conversion damages cited by SCA is Stout's testimony that SCA averaged $60,000 per week in receipts from its sales efforts with a low of $35,000. No other evidence of conversion damages was produced. In *Long*, the only evidence of conversion damages was plaintiff's testimony that the leasing data involved was worth $25,000. (27 Ill. App. 3d 1013, 1026.) The court in *Long* held that that testimony alone was an insufficient basis for establishing damages.

■■ Here too plaintiff's claim for damages is supported by the testimony of a single witness. Stout, SCA's president, testified simply that SCA suffered $24,000 in damages from Massello's conversion. There was no testimony as to what the value of the sales information was or whether the average weekly sales receipts dropped as a result of Massello's conversion. (See 27 Ill. App. 3d 1013, 1026.) Absent such evidence, we find that SCA failed to prove that it was damaged as a result of Massello's conversion.

■■ SCA next contends that Massello breached a covenant contained in his employment contract. The covenant provides that:

> "Employee covenants and agrees that during the term of this Agreement and for a period of one year after termination of this Agreement, the Employee will not directly or indirectly *accept employment* either as an employee, independent contractor, associate, partner, joint venturer, or in any direct or indirect capacity, with any client, former client or corporation controlling or controlled by any client or former client, or subsidiary of any client or former client. It is understood and agreed that by definition, 'Client' includes referred companies and companies solicited during the period of Employee's em-

ployment." (Emphasis added.)

SCA maintains that Massello breached this covenant when he solicited several of SCA's prospective clients within a year after leaving SCA's employ.

Although both parties address the reasonableness and enforceability of the restrictive covenant the initial issue is whether a breach of the covenant occurred under the facts of this case. SCA contends that the covenant prohibits solicitation of present and former clients whereas Massello contends that acceptance of employment is the only prohibited conduct. The fact that Massello solicited present and former clients of SCA within a year after leaving SCA is undisputed. The issue thus turns on the proper construction to be given the negative covenant.

The digests are replete with general rules on construction of contracts which serve to support both parties' positions. SCA emphasizes the rule that the court should adopt a reasonable construction rather than one which will produce an absurd result. (See *Business Development Services, Inc. v. Field Container Corp.* (1981), 96 Ill. App. 3d 834, 839, 422 N.E.2d 86.) SCA asserts that to interpret the negative covenant to allow Massello to actively solicit present and former SCA clients so long as they do not employ him is an absurd interpretation. Under this interpretation, Massello could actively solicit SCA clients for himself, during and after his employment with SCA, so long as he waited until the 367th day after leaving SCA before entering into an employment contract. SCA maintains that, upon examining the contract as a whole, such a construction is obviously contrary to the intent of the parties.

But where the contract is clear and unambiguous, the parties' intent is to be drawn only from the words used. (See *Ricke v. Ricke* (1980), 83 Ill. App. 3d 1115, 1118, 405 N.E.2d 351.) Here, the covenant provides that the employee shall not "accept employment" from present and former SCA clients. The plain meaning of the phrase "accept employment" does not encompass solicitation, and we do not construe the covenant as prohibiting solicitation. Our interpretation is consistent with the maxim that contract language should be construed mostly strongly against the maker since he chose the words and is responsible for any ambiguity. (83 Ill. App. 3d 1115, 1118.) Moreover, where as here, a negative employment covenant is involved, it should be strictly construed because it operates as a limitation on the right to pursue an employment opportunity. (See *Hagerty, Lockenvitz, Ginzkey & Associates v. Ginzkey* (1980), 85 Ill. App. 3d 640, 643-44, 406 N.E.2d 1145.) We find that the negative covenant prohibited Mas-

sello only from accepting employment from present and former SCA clients and that under this construction, no breach occurred.

■ SCA also contends that Massello and NBC tortiously interfered with SCA's contractual relations and business expectations. These torts, though closely related, are distinct and will be addressed separately.

The elements of the tort of interference with contractual relations are: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. (*Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98.) The contractual relations which Massello and NBC allegedly interfered with were between SCA and Conklin, Wilkins, Gressel, and Schreiber, all former SCA employees who went to work for NBC. The breach allegedly occurred when these employees solicited present and former SCA clients after leaving SCA's employ. The contractual provision which was allegedly breached is the same negative covenant which was discussed above with respect to Massello, and the analysis used there is applicable here and is dispositive of this issue.

SCA contends that its former employees breached the covenant in their contracts by soliciting, for NBC, present and former SCA clients. Massello and NBC contend that mere solicitation does not violate the restrictive covenant. The covenant prohibited the former SCA employees from "accepting employment" with present and former SCA clients for a period of one year after leaving SCA. Upon leaving SCA, the employees went to work for NBC and began soliciting, among others, present and former SCA clients. The former SCA employees did not accept employment from these clients and did not, therefore, breach the negative covenant entered into with SCA. Absent a showing that the covenant was breached, no action exists for inducing its breach. See *Haag Brothers, Inc. v. Artex International, Inc.* (1978), 60 Ill. App. 3d 141, 146, 376 N.E.2d 636.

SCA also contends that Massello and NBC tortiously interfered with SCA's reasonable business expectations. We discussed this tort in *Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 413 N.E.2d 98, and our analysis there is particularly instructive in the case at bar. A key consideration with respect to this tort is the matter of expectancies.

"An individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract

has a certain and enforceable expectation of receiving the benefits of the contract. When a business relationship affords the parties no enforceable expectations, but only the hope of continued benefits, the parties must allow for the rights of others. They therefore have no cause of action against a bona fide competitor unless the circumstances indicate unfair competition, that is, an unprivileged interference with prospective advantage. In sum, as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases." 90 Ill. App. 3d 547, 552.

Here, there is no evidence indicating that NBC interfered with any of SCA's contractual relations. In the one instance in which NBC solicited a prospect who was under contract with SCA, the solicitation was directed toward an area of service different than that which was covered by SCA's contract. The remainder of NBC's efforts were directed toward prospective clients who had no contractual relations with SCA. Under these circumstances, it is apparent that NBC was acting as a *bona fide* competitor and that in order to sustain its cause of action, SCA was obliged to prove that NBC competed unfairly. We fail, however, to find evidence of unfair competition.

■ SCA points to representations by NBC employees to prospective clients regarding their prior affiliation with SCA. NBC salespeople also informed prospects of specific projects which they worked on while at SCA. It is certainly not unusual or improper for a sales person to inform a prospective client about his previous employment and work experience in the field which is the subject of the sale. And upon examining the record, we fail to find evidence that, in communicating their background information to prospects, NBC salespeople made any misrepresentations or that they purposely created any misconceptions regarding any supposed identity between SCA and NBC. We find that NBC did not engage in conduct amounting to unfair competition and was therefore not guilty of tortiously interfering with SCA's business expectations.

■ SCA's next contention concerns the trial court's judgment for Massello on his counterclaim in the amount of $165,619.50. SCA contends that Massello failed to sustain his burden of proving his entitlement to the post-resignation commissions which constituted most of the judgment award.

As to Massello's counterclaim, the trial court's judgment order states:

"4. That judgment for commissions earned be and is hereby entered against the Plaintiff, SCHEDULING CORPORATION OF

AMERICA, and in favor of the Counter-Plaintiff, MICHAEL F. MASSELLO, in the sum of $165,619.50."

This order fails to set forth the findings of fact and conclusions of law upon which the judgment is based. It is true that a court need not recite its findings and conclusions in a case heard without a jury (87 Ill. 2d R. 366(b)(3)(i)), but in their absence, a reviewing court is left to conjecture as to the basis of the judgment below.

Regarding the counterclaim, the first issue addressed by the parties is whether Massello's yearly salary of $26,000 was properly included in the judgment award. The parties' arguments appear to presume that the salary was included in the award, but, upon examining the award, we conclude otherwise. The judgment award of $165,619.50 is exactly the amount listed in Massello's exhibit which itemizes only commissions allegedly due. Thus it is apparent that the trial court adopted the figures contained in Massello's exhibit in rendering judgment and that the judgment award excluded Massello's yearly salary. We feel that the trial court was correct in omitting the salary from its award because our examination of the 1974 and 1977 agreements and the evidence produced at trial leads us to conclude that the yearly salary provision in the 1977 agreement did not modify the terminable at will nature of the 1974 agreement. The two agreements at issue are unambiguous, and the proper interpretation to be placed on them is to be determined as a matter of law.

The supposed modification of the 1974 agreement was allegedly effected by the inclusion in the 1977 agreement of a yearly salary provision which states: "1. *Base Salary*: $26,000." Massello offered no evidence at trial that the parties intended that this provision should convert the 1974 agreement into a binding yearly contract. Furthermore, the 1977 agreement, which establishes Massello's compensation scheme, is consistent with the 1974 agreement which implicitly provides that Massello's compensation shall be determined under a separate instrument. We believe that, had the parties intended to modify the terminable at will nature of Massello's contract, they would have made their intentions explicitly clear and would not, as Massello contends, have implemented the modification by merely reciting a yearly salary figure. We find that Massello's contract with SCA was terminable at will at the time of his resignation and that therefore, the contract terminated when Massello resigned.

Our ruling as to the termination date of the contract raises questions as to Massello's entitlement to post-resignation commissions. It may be that Massello should receive some or all of the commissions he claims. He is clearly entitled to commissions on sales which occurred

prior to resignation, and, as to post-resignation sales, a commission is in order if it is established that Massello was the procuring cause of the sale. (See *Technical Representatives, Inc. v. Richardson-Merrell, Inc.* (1982), 107 Ill. App. 3d 830, 833, 438 N.E.2d 599.) In the absence of express findings by the trial court, we are unable to say that these factors received sufficient consideration in the court's decision. We also feel that Massello's evidence on these points was inadequate.

In support of his claimed commissions, Massello submitted an exhibit listing 114 separate items of commission. All but two of the commissions listed were drawn from a stipulation entered into between the parties. The stipulation categorized the sales on the basis of two criteria: when gross billing dollars were received and when SCA performed the work. The categories are entitled as follows:

> "SCHEDULE A -Gross Billing Dollars Received by SCA between February 22 and March 23, 1979.
>
> SCHEDULE B -Gross Billing Dollars Received by SCA between February 22 and April 5, 1979.
>
> SCHEDULE C -Gross Billing Dollars received by SCA after April 5, 1979, and within 1979 for work performed by SCA on or prior to April 5, 1979.
>
> SCHEDULE D -Gross Billing Dollars received by SCA after April 5, 1979, and within 1979 for work performed by SCA after April 5, 1979.
>
> SCHEDULE E -Gross Billing Dollars received in 1980 by SCA for work performed by SCA in 1980 for clients of SCA prior to 1980."

The stipulation does not indicate when the sales to each client were made or who the procuring causes of those sales were. The testimony at trial was equally unrevealing in this regard. Massello testified that of the 114 clients listed, he "sold" two of them, was "responsible" for the sales to 16 others, and had "some input" as to another 17. He conceded that another 10 clients were either "sold" or "started" after he resigned and that he merely had "contact with" another nine. Furthermore, two of the commissions listed on the exhibit amounting to $57,800 were not drawn from the stipulation and there was no evidence in the record as to what involvement Massello had with these sales which were "sold" by SCA in 1980, well after Massello's resignation. There was no testimony regarding the remaining 58 sales.

The trial court awarded Massello every item of commission

claimed in his exhibit. Upon admitting the exhibit into evidence over SCA's objection, the court stated that:

"[Massello] testified emphatically and descriptively as to the amount of money that is due and owing, and it's in the record."

We believe that the court was mistaken on this point. As evidenced by the foregoing review, it is apparent that Massello's evidence as to his entitlement to commissions was vague and incomplete. Massello bore the burden of proving his damages and the record fails to show that he met this burden. On remand, it will be necessary for Massello to come forward with evidence, as to each item of claimed commission, that the sales were made prior to his resignation or that his involvement with the post-resignation sales was such as to entitle him to commissions.

For the reasons expressed herein, we affirm the circuit court's judgment in the action by SCA against Massello. As to the judgment for Massello on his counterclaim, we reverse and remand to the circuit court with directions to proceed in accordance with the views expressed herein.

Affirmed in part; reversed in part and remanded with directions.

DOWNING and HARTMAN, JJ., concur.