**ILLINOIS TOOL WORKS, INC., Appellant,**

v.

**Ken HARRIS, Appellee.**

No. 14–04–00792–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 2, 2006.

Rehearing Overruled May 18, 2006.

John G. Bissell, Michael L. Samford, Houston, for appellant.

James J. Ormiston, Houston, for appellee.

Panel consists of Justices FOWLER, EDELMAN, and GUZMAN.

## OPINION

WANDA McKEE FOWLER, Justice.

The opinion of February 23, 2006, is withdrawn because of a typographical error on page two of the opinion and this substituted opinion issued in it's place.

Appellee, Ken Harris, sued appellant, Illinois Tool Works, for breach of contract. Appellee moved for partial summary judgment on the ground that the contract was unambiguous. Appellant opposed the motion, but did not move for partial summary judgment. The trial court granted appellee's motion for partial summary judgment and entered final judgment in appellee's favor. Appellant timely filed a notice of appeal. We reverse and remand.

## Factual and Procedural Background

Ken Harris was a pioneering developer of holographic technology. On May 25, 2001, Illinois Tool Works ("ITW") entered into a contract with Harris to purchase Harris's Direct Write holographic technology ("the technology") and engage Harris's specialized knowledge to further develop the technology. The contract involves multiple agreements executed together. The major portions of the contract are the Asset Purchase Agreement, the Employment Agreement, and the Consulting Agreement. The Consulting Agreement was to begin when the Employment Agreement expired at the end of two years. The contract provides that Illinois law will govern the contract.

The opening paragraphs of the Employment Agreement explain ITW's interest and purpose for hiring Harris:

**WHEREAS,** in consideration for and in order to induce ITW to enter into the Asset Purchase Agreements, Mr. Harris agreed to deliver this Employment Agreement and a certain Consulting Agreement;

**WHEREAS,** Mr. Harris, as a pioneering inventor of holographic technologies, has had substantial prior experience with respect to developing, manufacturing and marketing holographic technologies, equipment, products, and services;

**WHEREAS,** ITW seeks to hire Mr. Harris in order to enjoy continued access to his special skills and knowledge relating to the development, manufacture and marketing of holographic technologies, equipment, products, and services;

. . . .

Because of ITW's desire for Harris's particular skill, knowledge and experience, there were few opportunities to terminate Harris's obligations under the contract, as provided for in the following excerpted provision in the Employment Agreement:

> ***Term.*** The term of employment ("Term") shall commence on the Closing Date, and continue for two (2) years thereafter with Employee devoting himself to his duties as specified herein on a full time basis (forty (40) hours week [sic] ) for forty (40) weeks during each of the two years. The obligations hereunder shall terminate immediately without notice upon (i) the death of Employee; (ii) the total disability of Employee for a period in excess of six (6) weeks; (iii) *the voluntary resignation or retirement of Employee;* or (iv) for "just cause" as defined herein.... "Just Cause" shall mean (a) Employee has been convicted of criminal fraud, embezzlement, or a felony, or has been judicially determined to have committed intentional misfeasance or malfeasance in the performance of his duties hereunder to the detriment of ITW, which ITW believes, in good faith, could have a material adverse effect on its business; (b) Employee has committed a breach of the covenant not-to-compete ... or of the confidentiality agreement ...; or (c) if ITW believes in good faith that Employee has failed to devote his full business time or best efforts to the Business. ITW agrees that Employee may also be employed by the DuPont Company during the Term of this Agreement; provided, however, that such employment: (i) does not interfere with Employee's obligations and duties under this Agreement; and (ii) is limited to the development of a material or film for use with the Direct Write Technology, as defined in the Direct Write Asset Purchase Agreement.

(Emphasis added). Harris specifically negotiated for the italicized language to be included. The contract also contained clauses prohibiting Harris from assigning his employment obligations. Following the Employment Agreement, Harris was to continue working for ITW as a consultant.

Paragraph Six of the Employment Agreement addressed when the Consulting Agreement would become effective:

> 6. ***Consulting Agreement.*** After the expiration of this Employment Agreement Employee has agreed to become an independent consultant of ITW, in accordance with the terms and conditions of the Consulting Agreement, executed at the Closing of the Asset Purchase Agreement.

Like the Employment Agreement, the Consulting Agreement outlined ITW's interest in "continued access" to Harris's "special skills and knowledge." The term of the Consulting Agreement was to begin pursuant to the following provisions:

> **WHEREAS,** on May 25, 2003 and upon termination of the two (2) year Employment Agreement, ITW seeks to enjoy continued access to the special skills and knowledge of Mr. Harris relating to the development, manufacture and marketing of holographic technologies, equipment, products, and services
>
> [ ]
>
> ***Term.*** The term of this Consulting Agreement ("Term") shall commence on the termination of the Employment Agreement, which date is two (2) years from the Closing date, and continue for three (3) years thereafter, with the Consultant devoting himself to his duties as specified for twenty (20) weeks during each of the three (3) years. The obligations hereunder shall terminate immediately without notice upon the death of Consultant. ITW may terminate this Consulting Agreement prior to the end

of the three (3) year Term, if Consultant has committed a breach of the confidentiality agreement . . . or a breach of the covenant not-to-compete . . . to the detriment of ITW, or if ITW believes in good faith that Consultant has failed to devote his twenty (20) weeks per year or best efforts to the Business.

Utilizing the provision for which he specifically bargained, Harris terminated his employment with ITW in October 2001. He offered to work as a consultant beginning immediately, but ITW did not respond to his request. In May 2003, when the Consulting Agreement otherwise would have begun, Harris attempted to begin his consultancy. However, ITW claimed Harris had repudiated the entire contract and so did not allow him to perform under the Consulting Agreement. Harris brought suit and moved for partial summary judgment, which the trial court granted. Harris then sought attorney's fees pursuant to the contract and the trial court granted those in the Final Judgment. ITW appeals the grant of partial summary judgment.

The question we must answer is whether or not the term of employment could terminate under the Employment Agreement before the end of two years without Harris also terminating the Consulting Agreement.

### Analysis

### I. Choice of Law and Standard of Review

■■■ The parties contractually agreed to apply the law of Illinois to this contract. Texas courts will respect that choice and apply the law the parties choose. However, while the substantive law of Illinois may apply, we as the forum will apply our own law to matters of remedy and procedure. *In re Wells Fargo Bank Minn. N.A.*, 115 S.W.3d 600, 605 n. 7 (Tex.App.-

Houston [14th Dist.] 2003, original proceeding [mand. denied] ). Procedure includes standards of review. *Henderson v. Autozone*, No. 14–97–01226–CV, 2000 WL 1425223, *2 n. 1 (Tex.App.-Houston [14th Dist.], September 28, 2000, pet. denied) (not designated for publication) (citing *Billman v. Mo. Pac. R. Co.*, 825 S.W.2d 525, 526 (Tex.App.-Fort Worth 1992, writ denied); *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 787 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.)). The construction of an unambiguous written instrument is a matter of law. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex.1999). Therefore, we use Texas law to determine what deference to give the trial court's ruling, and Illinois law to construe the contract.

ITW appeals the trial court's grant of partial summary judgment. The trial court determined that the contract was unambiguous as a matter of law. We review legal determinations *de novo*. *MCI*, 995 S.W.2d at 651. When reviewing a partial summary judgment, we use the same standards as when we review a summary judgment. *Carlton v. Trinity Universal Ins. Co.*, 32 S.W.3d 454, 458 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). The movant has the burden of showing there is no genuine issue of material fact. *Id.* When determining if there is a disputed material fact issue precluding partial summary judgment, all evidence favorable to the non-movant is taken as true, every reasonable inference must be indulged in favor of the non-movant, and all doubts are resolved in favor of the non-movant. *Id.* In this case we are asked to make a purely legal conclusion: is the contract unambiguous and, if so, what is its meaning. There are no factual disputes. Thus, without any deference to the trial court, we utilize Illinois law to determine the meaning of the contract.

## II. Construing the Contract

### A. Principles of Contract Construction under Illinois Law

 When construing a contract, courts [1] are to give effect to the parties' intent. *Henderson v. Roadway Express*, 308 Ill.App.3d 546, 242 Ill.Dec. 153, 720 N.E.2d 1108, 1110 (1999). We determine the parties' intent using the plain and ordinary meaning of the contract's language, unless that language is ambiguous. *Id.* A contract is ambiguous only if it is susceptible to more than one reasonable construction. *Id.* If a contract is susceptible to more than one construction and one of those makes the contract fair, customary, and such as prudent people would naturally execute, while the other would make it inequitable, unusual, or such as reasonable people likely would not execute, we will adopt the rational and probable interpretation. *Nutrasweet Co. v. Am. Nat'l Bank and Trust Co. of Chicago*, 262 Ill.App.3d 688, 200 Ill.Dec. 101, 635 N.E.2d 440, 445 (1994). Stated differently, we will not construe a contract to achieve an absurd result. *Scheduling Corp. of Am. v. Massello*, 119 Ill.App.3d 355, 74 Ill.Dec. 796, 456 N.E.2d 298, 303 (1983). Also, we construe the contract so as not to render any of the language superfluous. *See Boulevard Bank Nat'l Ass'n v. Philips Med. Sys. Int'l B.V.*, 811 F.Supp. 357, 364 (N.D.Ill.1993) (applying Illinois law). When, as here, multiple agreements are executed together as part of the same transaction, we construe them in reference to one another because they are one contract. *In re Estate of Mayfield*, 288 Ill.App.3d 534, 223 Ill.Dec. 834, 680 N.E.2d 784, 789 (1997).

### B. The Contract is Not Ambiguous and Expresses the Parties' Intent for Harris to Work Continuously for Five Years

The contract evidences ITW's intent to have continued access to Harris's knowledge and skill in relation to the technology it purchased. However, although the contract evidences ITW's intent to have continued access to Harris for one purpose, it is poorly drafted insofar as it does not address what results if Harris resigns early. This dispute concerns whether, by ending his obligations under the Employment Agreement's Term, Harris also ended either or both parties' obligations under the remainder of the contract—specifically, the Consulting Agreement. To answer that question—which is not provided for in the express terms of the contract—we apply Illinois rules of construction.

ITW and Harris executed one contract with multiple parts. The three major components were the Asset Purchase Agreement, the Employment Agreement, and the Consulting Agreement. Each of these relate to the technology Harris developed with the express intent to make the technology developed further and marketable. Also evident in the contract is the key, continuous role Harris was to play in that development. Several provisions throughout the contract show this intent. We take each of the major components in turn, and then explain our interpretation.

#### 1. The Asset Purchase Agreement

The Asset Purchase Agreement is the lengthiest of the agreements. It concerns the sale of the technology. However, its terms also anticipate and emphasize Harris's role in further developing that technology so as to make it marketable. In addition to the normal terms of sale, the Asset Purchase Agreement has a condition

---

1. In this opinion, when referring to "courts," or "we," we simply mean any court utilizing Illinois substantive law.

precedent to purchasing the technology: Harris was required to execute both the Employment Agreement and the Consulting Agreement. Thus, both parties understood that ITW would not purchase the technology without Harris's contractual commitment to further develop the technology according to the terms of the Employment Agreement and the Consulting Agreement. Clearly, ITW was interested not only in the technology, but also in Harris's services as an employee and a consultant. Because we must harmonize each of the agreements, giving effect to each term so as to effectuate the parties' intent, we turn now to the various provisions of the Employment Agreement and the Consulting Agreement.

Reading the plain language of the two remaining major components—the Employment Agreement and the Consulting Agreement—it is clear that ITW hired Harris for one purpose: to further develop his technology over a continuous period and then assist in marketing that technology. His services were not intended for other projects. This was a nascent technology. Without continued involvement in the project, Harris's knowledge and skill would no longer be current or as useful.

### 2. The Employment Agreement

The "Whereas" clauses of the Employment Agreement, outlined above, elucidate ITW and Harris's understanding as they reference "continued access" to Harris's "special skills and knowledge." ITW wanted Harris's help over five years as his technology developed, changed, and went to market. The entire focus was development of the technology in every respect so ITW could successfully launch the technology.

Yielding additional support to our reading, the Term of the Employment Agreement discusses not only the duration of the contract and how the parties could termi-nate their obligations, but also contains a provision allowing Harris to work for Du-Pont. Although ITW otherwise prohibited Harris from other employment, it allowed his employment with DuPont for the specific purpose of developing products compatible with the technology. Presumably, that compatible technology was important to making the technology marketable and profitable. Regardless, it further shows that ITW wanted Harris's attention to focus solely on developing the technology in one way or another over the course of five years. Additionally, the Employment Agreement specifically forbids Harris to assign his obligations. Read in context of the entire Agreement, ITW and Harris contemplated an ongoing relationship focused solely on launching the technology. ITW believed that if Harris could not be continually involved, the purpose of the project and the Asset Purchase Agreement would not be achieved.

Later, in paragraph six, the Employment Agreement references the Consulting Agreement and states the Consulting Agreement will commence in accordance with its terms after the Employment Agreement expires. This paragraph, although the only instance using the term "expiration," reveals that the parties intended to operate under the Consulting Agreement only if the Employment Agreement expired. There were four ways to terminate the Employment Agreement early, but only one way for it to expire—if Harris worked for the full employment term.

The Consulting Agreement would not take effect unless the parties complied with its terms. Thus, we must turn now to the Consulting Agreement to determine whether or not the parties intended to allow Harris to resign and later, after no involvement with the technology for almost

two years, return as a consultant to the project.

### 3. The Consulting Agreement

■ Consistent with the other two Agreements, the Consulting Agreement explains that ITW entered into this Agreement so as to enjoy *continued* access to Harris's special knowledge and skill. It also contains provisions allowing his employment with DuPont and prohibiting his assignment of employment responsibilities. In two separate paragraphs, the Consulting Agreement specifically references when it will commence. The Term's first sentence states the Consulting Agreement begins upon "termination of the Employment Agreement, *which date is* two (2) years from the Closing date...." (Emphasis added). The clause, "termination of the Employment Agreement," is modified and described by the following clause, "which date is." While it would have been clearer had the parties used the word "expiration" in this clause as they did in paragraph six of the Employment Agreement, it still shows the parties' intent. They intended the Consulting Agreement to take place upon a termination of the Employment Agreement if the date of termination were two years from the closing date. To hold otherwise would rule the clause modifying "termination of the Em-

ployment Agreement" meaningless and superfluous.

■ Additionally, because Harris could not assign his duties and, given the wording of the "Whereas" clauses, we believe the Consulting Agreement reinforces the parties' intent to have Harris work continuously to develop the technology over the course of five years. Although we do not agree with ITW's argument that the contract establishes a condition precedent regarding what Harris must fulfil before beginning work as a consultant,[2] we do agree that Harris either had to work continuously over five years or, by exercising his right to terminate employment, terminate any other right to employment or a consultancy. The contract is consistent and repeats that theme throughout. It also is unambiguous in this situation: Harris would either work continuously for five years to develop the technology and compatible products, or exercise his right to terminate the agreement altogether. He did the latter.[3]

### C. Harris Terminated His Obligations under the Terms of the Contract

As Harris states in his briefing, he had the right to terminate his employment under the contract. If so exercised, the obligations under the contract would terminate immediately.[4] He exercised that

---

2. Illinois courts do not favor conditions precedent. *Boulevard Bank Nat'l Ass'n v. Philips Med. Sys. Int'l B.V.*, 811 F.Supp. 357, 365 (N.D.Ill.1993) (applying Illinois law) (citing cases). Without plain, unambiguous language, contracts are construed as not having conditions precedent. *Id.* In this contract, not only is there no plain, unambiguous language indicating conditions precedent for Harris's employment as consultant, but also the parties had expressly included a clause "Conditions Precedent" in the Asset Purchase Agreement. Thus, the parties specifically declined to make certain aspects of the contract conditions precedent. Consistent with Illinois law, we will not re-write the contract and

construe it to contain additional conditions precedent.

3. Had any of the other terms of the contract been used to terminate the obligations—such as just cause or disability—then the result would be the same. Pursuant to the terms of the contract, neither party would have a further obligation to fulfill under the Consulting Agreement.

4. There is a question neither party directly addresses in the briefing: exactly what does "hereunder" mean in the Term of the Employment Agreement? Stated differently, do the obligations "hereunder" encompass only

right and it terminated both parties' obligations under the entire contract in regard to his employment in any capacity. To conclude otherwise would render parts of the contract superfluous, which we will not do,[5] or achieve an absurd result, which we also avoid.[6] Our holding properly harmonizes the contracts so as to achieve the parties' intent.

**1. Harris's interpretation would render portions of the contract superfluous and directly conflict with the parties' express intent**

Harris encourages us to read the contract so as to say that he may exercise his right to end his employment before the end of two years and then accept his consultancy. That reading would render superfluous the other terms of the contract clearly expressing ITW's desire that Harris work continuously to develop the technology.[7]

We have detailed extensively the various provisions of the contract evidencing ITW's desire for continuous access to Harris and Harris only. As we have explained already, ITW envisioned that Harris would devote his time, over five years, to developing both the technology and companion technology. Harris was a "pioneering inventor" of this technology, which evidently was not developed completely. Regardless of Harris's specialized knowledge and skill, ITW did not anticipate he would be helpful to the process were he not involved continuously and exclusively. To hold otherwise would render superfluous those provisions of the contract clearly expressing that belief. Ours is the rational and probable interpretation.

**2. Harris's proffered construction would lead to an absurd result**

ITW argues in its briefing that Harris's construction would lead to an absurd result. To make the point, ITW offers two examples of what Harris's construction would allow: (1) Harris could work for one day, walk away from the contract, and ITW still would be required to hire him two years later as a consultant when he would no longer have current knowledge; and (2) Harris could be fired for just cause—such as embezzling money from ITW—and, again, ITW still would be forced to hire him as a consultant. We agree with ITW that these are absurd results. We also agree that Harris's reading would necessarily allow these results.

Harris counters both arguing that: (1) we may not re-write the contract to make it fairer than the parties contracted for;[8]

the Employment Agreement, or flow down to the Consulting Agreement as well? Our holding resolves this question by determining "hereunder" means the entire contract, including the Consulting Agreement. The Agreements are one contract, to be read together, and each follows the other. The Employment Agreement does not take effect without execution of the Asset Purchase Agreement, and the Consulting Agreement does not take effect without completion of the Employment Agreement. Thus, it follows, that if obligations under one terminate, so do obligations under the others unless specifically written to survive the employment and consultant relationships—such as the covenant not-to-compete. Our holding today in no way affects other terms of the contract meant to extend beyond any employment relationship.

5. *See Boulevard Bank Nat'l Ass'n,* 811 F.Supp. at 364.

6. *See Massello,* 74 Ill.Dec. 796, 456 N.E.2d at 303.

7. Harris evidently offered to work as a consultant immediately upon resigning his employment. However, such an arrangement was not contemplated under the contract and therefore does not affect our holding.

8. *See Frederick v. Prof'l Truck Driver Training Sch., Inc.,* 328 Ill.App.3d 472, 262 Ill.Dec. 535, 765 N.E.2d 1143, 1152 (2002).

and (2) had Harris done something worthy of firing for "just cause," he would have breached the contract and so ITW would be relieved of its obligations. Neither of these arguments is convincing.

As to the first, we have outlined already that ITW specifically contracted for Harris's continuous work on developing the technology. The terms of the contract provide that if Harris does not work continuously, then he may no longer work for ITW at all under this contract. Utilizing Illinois law, we will not re-write the contract to provide better terms for Harris than he bargained for—especially when such a re-write would render much of the contractual language superfluous and achieve a result wholly foreign the entire focus of the contract.

Concerning Harris's second argument, it does not line up with the contract's language. If Harris were fired for embezzling, it would not be for a breach of contract. Indeed, the contract contains no clauses that would be breached by embezzlement or criminal fraud. Rather, termination for just cause would be pursuant to the contract's clear language. Just as Harris recognizes in his brief that "Harris' resignation did not constitute a breach of the Employment Agreement ...," neither would each element of just cause be a breach of contract. The contract lists several reasons for which ITW may fire Harris for just cause. Some of those, such as violating the covenant not-to-compete, would breach other contract provisions. Others reasons, such as those ITW notes, would not. Thus, if Harris acted in a way constituting "just cause," it does not follow that he necessarily would have committed a material breach and thus excuse ITW from further performance. Additionally, it is possible that, under Harris's interpretation, a breach of the Employment Agreement's term would not invalidate the Consulting Agreement. Under Harris's reading, ending one agreement does not necessarily end the others. Thus, it does not follow under his reading that if his employment ended for "just cause" that the Consulting Agreement also would end.

We will not adopt a construction that would lead to absurd results, render parts of the contract superfluous, and ignore the parties' intent.

### 3. Our reading does not result in a forfeiture

Harris attempts to frame the case as one involving a possible forfeiture. Arguing that Illinois does not favor forfeitures, Harris contends that ITW's reading would result in a forfeiture of the Consulting Agreement unnecessarily. *See generally Allabastro v. Wheaton Nat'l Bank*, 77 Ill. App.3d 359, 32 Ill.Dec. 831, 395 N.E.2d 1212, 1216 (1979) (stating that Illinois courts narrowly construe contractual provisions upon which forfeitures are based). Yet, forfeiture is not at play in this case.

As an initial matter, we agree with Harris that Illinois law disfavors forfeiture. However, the cases we have found regarding forfeiture involve primarily installment land-contract cases, which included equitable concerns. *See generally Allabastro*, 32 Ill.Dec. 831, 395 N.E.2d at 1213, 1217; *Hettermann v. Weingart*, 120 Ill.App.3d 683, 76 Ill.Dec. 216, 458 N.E.2d 616, 617 (1983). The same facts and concerns are not present in this case. Additionally, the result we reach does not amount to a forfeiture or penalty. Harris voluntarily exercised his right under the contract and thus voluntarily relinquished his right to a consultancy. There is no forfeiture and those cases are inapposite.

### III. We Do Not Address ITW's Alternative Arguments

ITW raises two other arguments upon which we may reverse: (1) The contract

language is ambiguous; and (2) Harris anticipatorily breached. Because our disposition of the first issue disposes of the entire appeal, we do not reach these other questions.

## Conclusion

Because we determine the contract is unambiguous in favor of ITW, we reverse and remand for further proceedings consistent with this opinion.